CLAIROL, INCORPORATED, Respondent, v MOORE-MCCOR-MACK LINES, INC., Appellant, et al., Defendant.

First Department, February 26, 1981

APPEARANCES OF COUNSEL

*Lawrence J. Mahoney* of counsel *(Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito,* attorneys), for appellant.

*Seymour Simon* of counsel *(Graham & Simon, P. C.,* attorneys), for respondent.

**OPINION OF THE COURT**

MURPHY, P. J.

The operative facts are fairly stated in the opinion at Special Term (103 Misc 2d 208). It should also be noted

that clause 13 of the bill of lading is substantially the same as the controlling provision in the Carriage of Goods by Sea Act (COGSA) (US Code, tit 46, § 1304, subd [5]). Special Term decided this dispute under COGSA rather than under the bill of lading.

As a general rule, this court must decide a case on the law as it exists at the time of its decision *(Matter of Temkin v Karagheuzoff,* 34 NY2d 324, 329). In this area regulated by COGSA and the Harter Act (US Code, tit 46, § 190 *et seq.),* this court must follow Federal law. Particular deference must be taken of the pursuasive authority of the Second Circuit cases in this area. (See *M. & T. Trust Co. v Export S. S. Corp.,* 262 NY 92.) In a recent opinion *(Mitsui & Co. v American Export Lines,* 636 F2d 807) that postdated Special Term's decision, the Second Circuit Court of Appeals reached conclusions that were virtually identical with those of Special Term. The Second Circuit in *Mitsui* abandoned the "functional economics" test that it had propounded in *Royal Typewriter Co., Div. Litton Business Systems v M/V Kulmerland* (483 F2d 645, 648, 649). Instead, it chose to follow the approach taken in *Leather's Best v S.S. Mormaclynx* (451 F2d 800) that normally a container supplied by a carrier is not a COGSA "package" if its contents and the number of units are disclosed. As a corollary, it may be said that the Second Circuit will now treat the packaged units, declared in a bill of lading, to be the "packages" under COGSA.

Carmen, the shipper, disclosed to Moore-McCormack, the carrier, that the subject container had been filled with 2,555 cartons of curlers. Under the approach advanced in *Mitsui (supra),* the cartons must be considered the "packages" for COGSA purposes. It should be emphasized, however, that COGSA does not control in this proceeding because the cartons disappeared after they were discharged from the vessel (US Code, tit 46, § 1301, subd [e]). Nonetheless, the contract of carriage continued to govern the parties' relationship after discharge but before delivery *(Leather's Best v S.S. Mormaclynx, supra,* at p 807). Under clause 13 of that contract, Moore-McCormack must be held liable as a bailee for the loss of these "packages". Its

liability may be upheld under a theory of breach of contract or negligence.

In passing, two other observations should be made. First, the general maritime law, rather than New York law, governs the bailment issue raised in this proceeding (*David Crystal, Inc. v Cunard S.S. Co.*, 223 F Supp 273, 284, affd 339 F2d 295, 298, cert den 380 US 976). At this point in time, the Federal courts have not yet adopted the reasoning in *I.C.C. Metals v Municipal Warehouse Co.* (50 NY2d 657) that a bailor is entitled to summary judgment against a bailee on the theory of conversion if the bailee cannot satisfactorily explain the disappearance of goods from a warehouse or terminal. In the future, the Federal courts may be unwilling to find that a bailee should be held responsible for conversion in this situation absent proof that the bailee, rather than a third person, actually converted the property. Until the Federal courts have addressed themselves to this question, it would be premature for the court to conclude that *I.C.C. Metals* forms a part of general maritime law.

Second, had the "functional economics" test been reached upon this appeal, a finding would have been made that the metal container was the "package". Even if the affidavit of Moore-McCormack's expert, Allen, is discounted, the depositions of Daddio, Otto and Nohr overwhelmingly indicate that it was not feasible to ship the curlers in a "break bulk" fashion on an ocean-going vessel. Given a choice, both Clairol and Carmen had always shipped the cartons of curlers in containers rather than in a "break bulk" manner. While there is some indication that, in limited instances, the cartons had been shipped "break bulk", it is evident from the testimony that this was a matter of necessity rather than of choice. The shipment of the cartons on pallets, when an airplane was used, only reinforces the conclusion that it was not feasible to ship the cartons as "break bulk" cargo. Although Clairol distributed the cartons by trailer in the United States, that mode of transportation presented risks that were clearly less severe than those occasioned on an ocean-going vessel. Theoretically, any product could be shipped "break bulk" in a vessel if extreme safety measures were taken by the crew and the longshoremen. However, as a practical matter, many

products, such as these curlers, could not withstand the ordinary handling and hazards of "break bulk" shipment upon an ocean-going vessel.

Accordingly, the order of the Supreme Court, New York County (SHAPIRO, J.), entered February 19, 1980, which, *inter alia,* (i) granted Clairol's motion for summary judgment against Moore-McCormack, (ii) directed an assessment of damages, and (iii) denied Moore-McCormack's motion for partial summary judgment limiting its liability to $500, should be affirmed, with costs.

LUPIANO, J. (concurring). The relevant facts in this lawsuit are not in dispute. Plaintiff Clairol had purchased curlers from A/S Carmen Curlers of Kalundborg, Denmark (the manufacturer). The goods were to be shipped to the Port of New York by defendant Moore-McCormack on the vessel *Mormacstar.* The shipment, as indicated by the bill of lading, was to consist of 17,854 cartons of curlers loaded into seven 40-foot-long containers belonging to Moore-McCormack. Moore-McCormack, engaged in the business of common carriage of merchandise by sea, admits receipt of the seven containers in Copenhagen and delivery of the containers to Berth 72, Port Elizabeth, New Jersey.

One cargo container, No. CTIU 206927, containing 2,555 cartons of curlers, could not be located. At an examination before trial, one Otto, employed by the Danish manufacturer, testified that after a container was loaded with cargo its doors were closed and then sealed. The seal number would be recorded on the invoice, and, in fact, Moore-McCormack recorded receiving the *sealed* container.

The aluminum containers, which were 8 feet wide, 8 feet high, and 40 feet long, were reusable. The reason for use of containers was that it simplified cargo handling and decreased shipping expenses. The container not delivered to Clairol was later found empty on a Manhattan street. The market value of the missing cargo was stated to be $87,999.

When Moore-McCormack refused to pay for the loss, Clairol sued for damages of $100,000. Moore-McCormack, in its answer, cross-claimed against the terminal, International Terminal Operating Co., Inc. Plaintiff Clairol

moved for summary judgment against Moore-McCormack, and Moore-McCormack cross-moved for partial summary judgment, urging that, according to the provisions of the Carriage of Goods by Sea Act (COGSA) (US Code, tit 46, §§ 1300, 1304, subd [5]), its liability is limited to $500 per package and that the shipping container itself, and not its contents, is the "package." The plaintiff contends, however, that the "package" intended is each separate carton within the container and that, in consequence, a full recovery for the value of the missing merchandise may be had, albeit in excess of $500.

We must start with section 1304 of title 46 of the United States Code, which provides, in pertinent part: "Amount of liability; valuation of cargo. (5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier." It is noted that the statute in question was enacted in April, 1936 before the advent of containerization of cargo.

The Federal Court of Appeals for the Second Circuit has ruled that the term "package" may relate to the unit in which the shipper packed the goods, rather than the container provided by the sea carrier, which was characterized as functionally part of the ship itself *(Leather's Best v S.S. Mormaclynx,* 451 F2d 800, 815). As aptly noted by the Second Circuit: "we cannot escape the belief that the purpose of § 4(5) of COGSA was to set a reasonable figure below which the carrier should not be permitted to limit his liability and that 'package' is thus more sensibly related to the unit in which the shipper packed the goods and *described them* than to a large metal object, functionally a part of the ship, in which the carrier caused them to be 'contained' " *(Leather's Best v S.S. Mormaclynx, supra,* at p

815; emphasis supplied).[1] That concept was adhered to in subsequent cases in the Second Circuit *(Cameco, Inc. v S.S. American Legion*, 514 F2d 1291, 1299; *Shinko Boeki Co. v S.S. "Pioneer Moon"*, 507 F2d 342, 344).

With respect to what constitutes a "package" within the limitation of liability provision of COGSA, it has been noted that "[t]echnological advances have resulted in the widespread use of shipping containers, which presents the problem of a package within a package. With respect to the question whether the shipping container itself with the container's contents constitutes the 'package' within the meaning of COGSA, some courts have fashioned a 'functional economics' test or a 'functional package unit' test, according to which a presumption is created that the container is not the package, where the shipper's own packaging units are functional, but which, conversely, places the burden upon the shipper or upon the consignee to prove that the shipper's units are by themselves packages, where the shipment is not in a functional packing unit." (What Constitutes "Package" or "Customary Freight Unit" Within Limitation of Liability Provision of Carriage of Goods By Sea Act [46 USCS § 1304(5)], Ann, 27 ALR Fed 661, 665-666.)

In *Royal Typewriter Co., Div. Litton Business Systems v M/V Kulmerland* (483 F2d 645), the Second Circuit was concerned (p 646) with "the question whether the limitation of $500 damages 'per package' in the Carriage of Goods by Sea Act ('COGSA'), 46 U.S.C. §§ 1300, 1304(5), applies only to the overall container itself, thus limiting the carrier's liability * * * or to each of the individual cartons so as to warrant recovery by the shipper for the loss of all its cartons". The evidence in that case showed that the goods (adding machines) were packed in individual cartons "totally impracticable" for "shipment overseas" and that before the advent of containerization, such goods were shipped in wooden crates or cases secured by metal bands. When

1. While the goods involved herein were loaded by the shipper in its own packing cartons for shipment, the shipper subsequently apparently loaded these packing units in the aluminum containers supplied by the carrier. However, the bill of lading specifically itemized the number and type of cartons per container.

containerization came into being, the shipper abandoned such shipping practice and began to use single-wall corrugated cartons sealed with thin paper tape. Further, the bill of lading in *Kulmerland* referred to each numbered container *without* any reference to the number of cartons of adding machines.

In fashioning the "functional economics test" in *Kulmerland (supra)*, Judge OAKES declared: "The statutory purpose here leads us to suggest what for want of a better term we will call the functional economics test. In this regard, the first question in any container case is whether the contents of the container could have feasibly been shipped overseas in the individual packages or cartons in which they were packed by the shipper * * * We view *Leather's Best* as holding that, where the shipper's own packing units are functional, a presumption is created that a container is not a 'package' which must be overcome by evidence supplied by the carrier that the parties intended to treat it as such * * * When * * * the shipper's own individual units are not functional or usable for overseas shipment the burden shifts to the shipper to show why the container should not be treated as the 'package' * * * Absent shipment in a functional packing unit, the burden is on the shipper to show by other evidence that his units are themselves 'packages.' *Only then* does custom and usage in the trade, the parties' own characterization or treatment of the items being shipped in supporting documentation or otherwise, and any other factor bearing on the parties' intent become relevant, as in *Standard Electrica* [*Standard Electrica, S. A. v Hamburg Sudamerikanische Dampfschiffahrts-Gesellschaft*, 375 F2d 943, cert den 389 US 831] or *Leather's Best*" (*Royal Typewriter Co., Div. Litton Business Systems v M/V Kulmerland, supra*, at pp 648-649; emphasis supplied).

Applying the "functional economics test", we confront the initial question of whether the contents of the container could have feasibly been shipped overseas in the individual packages or cartons in which they were packed by the shipper. Study of the record herein mandates the conclusion that the shipper's own packaging units are functional. Mr. Daddio, the head of plaintiff's traffic department, stated, in pertinent part at his examination before trial, that the

subject goods were shipped in the same manner since 1966, in a shipping container "tested for re-shipping," a container used only for shipping and which was quite distinct from the container used to display this product in retail stores. Indeed, the products were distributed from plaintiff's plant to its retailers in the same carton in which it arrived from abroad. Further, the same containers were utilized by plaintiff *both* for air freight and for ocean freight.

Although plaintiff, according to Daddio, utilized air freight transportation since 1966, it was only in 1967 that it utilized "ship water transportation" for the first time. Since then, significantly, plaintiff has used *both* methods of transportation. With respect to the air transportation, the plaintiff's shipping packages "came in on airline pallets * * * that measured 125 inches long by 80 inches wide, and then they did what they call build the goods up on a pallet so that it contours to the inside of the plane * * * [t]hen they would bat it down with a netting * * * to keep it from shifting." Regarding water transportation, the carrier would utilize the technical advance of large, standard size, shipping containers.

Mr. Daddio also unequivocally declared that plaintiff's goods (packaged in plaintiff's shipping packages) were suitable for "break bulk carriage," provided reasonable care was employed by the carrier. He specifically noted that the cartons were suitable for break bulk carriage because "we ship them out as individual cartons when we ship them as far as Texas and California in 40 foot trailers where we load other freight with them." He further particularized regarding "break bulk" shipping of the packages, as follows: "Well, if it was stowed with its own type of cargo, I would say it would make it across safely, but if somebody were *so careless* as to put a heavy piece of machinery on top of it, I don't think that it would get here in good shape" (emphasis supplied).

In another pertinent (container) case, *Cameco, Inc. v S.S. American Legion (supra,* at p 1299), Judge OAKES, writing for the Second Circuit, noted that where "the use of the container was as much for the shipowner's benefit as for the shipper's" and where "the bill of lading specifically set

forth the number of cartons * * * unlike the one container said to contain machinery in the *Kulmerland* case or the one container said to contain household goods in the *Rosenbruch* case" *(Rosenbruch v American Export Isbrandtsen Lines, 357 F Supp 982)*, the goods shipped met the functional packaging unit test of *Kulmerland (supra)* and "put the burden of proof on the carrier to supply evidence that the parties intended to treat the container as a package", which burden the carrier failed to carry. *(Cameco, Inc. v S.S. American Legion, supra,* p 1299.) He analogized this case to *Leather's Best (supra)*, and concluded that the container was not a single "package" within the provision of COGSA limiting the carrier's liability to $500 per package.

The evidence in the case now before us shows that the goods were packed in individual cartons which were practicable for shipment overseas; and that the same type of carton was utilized for both water and air transportation, as well as cross-continent by truck trailer (cf. *Royal Typewriter Co., Div. Litton Business Systems v M/V Kulmerland, supra)*; that the bill of lading specifically enumerated the number of individual cartons in each container, thereby evidencing an intent that each individual carton be regarded as a package (cf. *Standard Electrica, S. A. v Hamburg Sudamerikanische Dampfschifffahrts-Gesellschaft, supra;* see *Cameco, Inc. v S.S. American Legion, supra)*; that the use of the container was for the benefit of both the carrier and the shipper (see *Cameco, Inc. v S.S. American Legion, supra)*, and thus accords with the presumption afforded by the "functional economics test" that the container is not a package within the limitation of liability provision of COGSA (see *Royal Typewriter Co., Div. Litton Business Systems v M/V Kulmerland, supra; Leather's Best v S.S. Mormaclynx,* 451 F2d 800, *supra)*.

To reiterate: under the heading "Number and kind of packages; description of goods", the bill of lading acknowledged receipt of 17,854 individual cartons of curlers loaded into seven 40-foot-long containers belonging to defendant Moore-McCormack Lines, Inc. On the continuation sheet, the specifications show that in the container No. CTIU 206927, which disappeared from the terminal at New York, there were stowed 1,838 cartons of curlers style No. K-20;

and 717 cartons containing curlers style No. FT-2 for a total of 2,555 cartons. There were three individually boxed electrical hair curler sets packed in each master shipping carton. The gross weight of each shipping carton with its three inner boxes averaged about 16 pounds. The shipping cartons, which cannot be reused once they are opened, were suitable for shipping by air and by water and for further transportation by truck in distribution to plaintiff's customers after unloading from the steamship containers. These master shipping cartons were tested for shipping and distribution.

Further, defendant Moore-McCormack Lines, Inc., does not dispute on this record the statement that the manager of the Insurance and Claims Division admitted at examination before trial in response to the query as to whether the term "package" in the shipping industry denotes the 40-foot aluminum container or the shipper's individual packing carton—"as a steamship man, when you are talking packages, we refer to cargo as drum cargo, units and packages. If I was walking down the pier and they said 'There are 100 packages by door No. 29,' I would be thinking of individual packages, not of a container."

Applying the "functional economics test" to the circumstances demonstrated by plaintiff, we must initially conclude that a presumption is created that the container is not the package within the limitation of liability provision of COGSA. In order to rebut such presumption, the carrier, in opposition to plaintiff's motion for summary judgment, submits an affidavit of an alleged expert on the stowage, packaging and carriage of cargo, to wit, Marine Consultant Captain M. W. Allen. His affidavit is to the effect that the sample carton shown to him as representing plaintiff's shipping cartons is not adequate for ocean carriage unless stowed in a metal container. The affidavit is conclusory in nature and rests upon an insufficient basis, to wit, an empty external shipping sleeve or carton not supported by internal packaging and, therefore, not representative of the actual shipping package. Further, the generalization that the goods would be subject to water damage without additional protection is a *non sequitur* as any cargo is subject to potential water damage.

However, we assume for the sake of analysis that Captain Allen's affidavit is sufficient to rebut the presumption that the container is not a "package". This does not of itself create a new presumption that the container is the "package" because we cannot conclude whether or not the shipper's individual cartons are functional apart from speculation. At this point, custom, usage, the parties' own characterization or treatment of the items being shipped, as evidenced by supporting documentation or otherwise, become relevant. Viewing the circumstances from this perspective, it is unequivocally clear that the shipper's individual shipping cartons were each regarded as a "package". This conclusion is based on the bill of lading and its related documentation, the custom and usage engaged in by the shipper in utilizing its shipping cartons for all manner of transportation, and the admission by the carrier by way of "notice to admit" and by the testimony of its claims manager that its metal containers function as equipment for handling packages and is not the package itself.

It should also be noted that Mr. Otto, the comptroller for A/S Carmen Curlers, stated in his examination before trial, as follows:

"Q. Do you know whether or not any curlers of the same kind that are described in these invoices were shipped any time break bulk—by break bulk I mean just the cartons themselves with no sea containers?

"A. I think so, we shipped to Australia and South Africa that were not in containers, as far as I know.

"Q. Have you had any complaints from any of your customers regarding the nature of the packaging of these shipments?

"A. I do not think we have had any major complaints, but once in a while there will always be a carton which is misconducted, but basically we have had no complaints.

"Q. By misconducted you mean that became damaged in transit?

"A. OK, if you export 5 million units per year equal to 700,000 boxes there will always be one which is breaking because it is placed the wrong place or something."

Further, Mr. Otto in response to a question as to whether the master cartons could be shipped "break bulk", stated: "if you are asking whether I consider the cartons strong enough to go on their own, these cartons are used to be sent to customers all over the world after they have been discharged from containers or whatever it is, so *they are strong enough to go by their own*" (emphasis supplied). Mr. Otto acknowledged that he would rely on the advice of his shipping manager.

Only recently, the Second Circuit Court of Appeals has rejected the "functional economics test" set forth in *Royal Typewriter Co., Div. Litton Business Systems v M/V Kulmerland (supra)* and *Cameco, Inc. v S.S. American Legion (supra) (Mitsui & Co. v American Export Lines,* 636 F2d 807). That court specifically embraced the rationale of its prior decision in *Leather's Best v S.S. Mormaclynx (supra)*, and noted that as subdivision (5) of section 4 of COGSA (US Code, tit 46, § 1304, subd [5]) does not include any definition of the term "package", the ordinary common sense meaning of the term applies, citing the Ninth Circuit in *Hartford Fire Ins. Co. v Pacific Far East Line* (491 F2d 960, 963, cert den 419 US 873). Further, the Second Circuit declared, at page 816 of its opinion in *Mitsui & Co. (supra)*: "Taking account of all this, we have characterized a container as 'functionally a part of the ship', *Leather's Best, Inc. v. S.S. Mormaclynx* * * * The Supreme Court has observed, in a different but not unrelated context, that 'the container is a modern substitute for the hold of the vessel'. *Northern Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 270 * * * (1977)." It was also noted that *Leather's Best*, 451 F2d 800 *(supra)* stood for the proposition "that at least when what would ordinarily be considered packages are shipped in a container supplied by the carrier and the number of such units is disclosed in the shipping documents, each of those units and not the container constitutes the 'package' referred to in § 4(5)" *(Mitsui & Co. v American Export Lines, supra,* at p 817). The present appeal presents an analogous factual situation.

Noting that the result in *Cameco (supra)* is consistent with *Leather's Best (supra)*, the Second Circuit perspicaciously declared: "Clearly the goal of international uni-

formity is better served by the approach in *Leather's Best* that generally a container supplied by the carrier is not a COGSA package if its contents and the number of packages or units are disclosed, than by the functional economics test of *Kulmerland*. For all these reasons this panel respectfully declines to follow the functional economics test set forth in *Kulmerland"* *(Mitsui & Co. v American Export Lines, supra*, at p 821).

Accordingly, whether under the *Leather's Best* rationale or under the now rejected "functional economics test" of *Kulmerland* (483 F2d 645, *supra)*, the shipper's cartons herein and not the carrier's containers function as the packages within the meaning of COGSA.

"Before * * * the Harter Act, it was the settled law of this country, as declared by this court, that common carriers, by land or sea, could not by any form of contract exempt themselves from responsibility for loss or damage arising from negligence of their servants, and that any stipulation for such exemption was void as against public policy; although the courts in England and in some of the States held otherwise." *(Knott v Botany Mills*, 179 US 69, 71.) "The Harter Act is a legislative declaration of the national policy binding all courts: 'This express provision of the act of Congress overrides and nullifies the stipulations of the bill of lading that the carrier shall be exempt from liability for such negligence, and that the contract shall be governed by the law of the ship's flag.' Thus in any matter which is covered by our statutes either the Harter Act or now the Carriage of Goods by Sea Act our courts both federal and state have been mandated to read all contracts which come within the scope of our statutes in the manner Congress directs. The statutes declare our public policy" (Robinson, Admiralty, § 77, p 547).

In *Straus & Co. v Canadian Pacific Ry. Co.* (254 NY 407), the Court of Appeals was concerned with a silk shipment on a through bill of lading from Shanghai to Vancouver, thence by rail to New York. The goods were stolen during the water transit *between ports of foreign countries.* There the Court of Appeals was not obligated to apply the Harter Act and determined the case solely on the public

policy of New York. The Court noted (pp 411-412) that where the United States Congress has not acted so as to impose uniformity on the Federal and State courts, "the courts of this State continued to follow their early decisions, and enforced agreements exempting common carriers from liability for negligence * * * [a]lthough the United States courts and the courts of most of the States adhered to the Federal rule". It was then noted (p 413) that the historical evolution of the policy of New York State has brought it into conformance with the Federal rule "to the effect that contracts which purport to totally exempt * * * from liability for negligence are against the public policy of the State and the early decisions, which expressed a different view and represented the public policy of the State when made, have been superseded". Further, it was noted (p 415) that the conflict of laws principle as to what law applies—the law of the place of performance or the law of the place of contracting do not apply "in cases where acts of Congress have taken the question out of the domain of the State law".

A critical distinction exists "between the management of the ship on the one side, and the care and custody of the cargo. If the error or neglect can be hung on the 'cargo' peg rather than on the 'vessel' peg the shipowner is held liable for the acts of his servants. It is true that the Carriage of Goods by Sea Act, section 7, 46 U.S.C.A. § 1307, allows carrier and shipper to agree as to the responsibility and liability of the carrier for losses in connection with the custody and care and handling of the goods prior to the loading, and subsequent to the discharge from the ship. But the provision must be read in connection with section 12, 46 U.S.C.A. § 1312. By section 12 the new act is not to be construed to supersede the Harter Act or any other law in so far as they relate to the duties or liabilities of the ship or carrier prior to the time when the goods are loaded on, or after the time they are discharged from the ship. The Harter Act provisions have been shown. They make the owner liable for his servants' negligence in care and custody of cargo * * * The Carriage of Goods by Sea Act * * * supersedes the Harter Act, in foreign trade, with respect to the care of the goods *during actual transportation*" (Rob-

inson, Admiralty, § 72, at p 517; emphasis supplied). Further, it must be noted that under COGSA, the list of exemptions "does not include an exemption from liability for negligent failure to care for cargo. The carrier is relieved of liability for non-listed causes only if the loss is from 'any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the servants of the carrier.' This leaves the carrier liable for cargo losses which are attributed to cargo rather than vessel mishandling" (Robinson, Admiralty, § 72, at p 518). "Upon arrival of the vessel at the contractual port of delivery, the carrier is obligated to effect 'proper delivery' (Harter Act) or 'properly . . . discharge the goods carried' (Carriage of Goods by Sea Act)" (2A Benedict, Admiralty [rev 7th ed], § 111).

It has also been noted "that no bill of lading provision can exempt the carrier from liability for theft of cargo by the officers and crew" and "the unexplained loss of cargo * * * incurs liability on the carrier". (2A Benedict, Admiralty [rev 7th ed], § 112).

An excellent discussion of agreed valuations under the Harter Act is set forth in Robinson on Admiralty (§ 76, pp 540-543). It is duly noted therein that the carrier is not free to make a stipulation as to agreed value offhand, citing *San Giorgio I v Rheinstrom Co.* (294 US 494, 497) which declares: "[s]uch a stipulation, we have said, is not enforcible unless the shipper, for agreeing to such a limitation of the carrier's liability, receives a consideration consisting in the offer of a lower rate as against a higher rate offered for the service without such limitation; or, as has been said, the rate is tied to the release." I assume for purposes of this analysis that the freight rate herein is tied to the release. In passing, I note that the freight (apart from the rate) that was charged for the shipment was based solely on the cubic measurements of the shipper's packages alone, without reference to the carrier's sea containers.

Apart from the aforesaid, there is another basis upon which liability for the loss of plaintiff's goods without limitation attaches to the defendant carrier. Defendant Moore-McCormack Lines, Inc., by virtue of "Notice to Admit," has admitted, *inter alia*, the following:

"(9) That pursuant to the provisions of 46 U.S.C. 191, which is applicable to this litigation, the defendant, Moore-McCormack Lines, Inc., was required to care for and make proper delivery of the shipment; and, no provision in its Bill of Lading may lessen, weaken or avoid such obligation * * *

"(17) After the carrying vessel arrived at the port of discharge, Williamson Transportation Company came to the terminal designated by the defendant, Moore-McCormack Lines, Inc., at Port Elizabeth, New Jersey, for the taking of delivery of the seven containers covered by the Bill of Lading on or about September 3 and 4, 1970, but delivery was made of only six of the seven containers.

"(18) Although Williamson Transport Company, presented a delivery order signed by Export-Import Services, Inc., the plaintiff's custom broker, authorizing Williamson Transport Company to take delivery on behalf of the plaintiff of the seven containers shown on the attached Bill of Lading, Container CTIU 206927 could not be located.

"(19) The said container was not delivered by the defendant, Moore-McCormack Lines, Inc., or its agent or representatives at the port of discharge because the container had disappeared *unaccountably* from the terminal used by the defendant, Moore-McCormack Lines, Inc.

"(20) Several days after the other containers covered by Bill of Lading 211 were delivered, Container CTIU 206927 was located empty of its cargo in the streets of Manhattan.

"(21) The defendant, Moore-McCormack Lines, Inc., is unable to testify as to the circumstances how the container was thus located" (emphasis supplied).

In *David Crystal, Inc v Cunard S.S. Co.* (339 F2d 295, 297), the Second Circuit characterized the effect of the bill of lading after discharge of the cargo, as follows: "The District Court was of the opinion that the bill of lading became inoperative once the cargo was discharged. We believe, however, that it is more precise to say that although the bill continued to govern the parties' relationships after discharge, *its terms did not insulate [the carrier] from liability.* It is true that the bill provided that [the carrier's] responsibility would cease when delivery was made from

the ship's deck and that if the consignee did not immediately receive the goods, [the carrier] could simply abandon them on the wharf. But these clauses were clearly null and void under the Harter Act's restrictions against certain stipulations seeking to relieve carriers from liability. 46 U.S.C. § 190" (emphasis supplied). The carrier upon discharge of the cargo occupied the status of a bailee of the goods *(David Crystal, Inc. v Cunard S.S. Co.,* 339 F2d, at p 298). Further, the Federal appellate court observed (p 298), in respect of the Restatement rule imposing absolute liability upon a bailee for misdelivery of cargo, that "the rule of absolute liability represents a sound allocation of responsibility for the bailee is in a better position than the bailor to establish procedures to minimize the risk of misdeliveries and to insure against the few misdeliveries that will inevitably occur despite the most careful precautions".

In accord with its analysis in *David Crystal, Inc. (supra)*, the Second Circuit in *Leather's Best v S.S. Mormaclynx*, (451 F2d, *supra*, at p 816), duly noted that "[t]he framers of COGSA were at considerable pains to make clear that it applies only to 'the carriage of goods by sea to or from ports of the United States, in foreign trade.' 46 U.S.C. § 1300 (enacting clause). Section 1 (e) defines 'carriage of goods' as covering 'the period from the time when the goods are loaded on to the time when they are discharged from the ship.' 46 U.S.C. § 1301(e). Section 12 leaves the issue of liability for the period prior to loading or after discharge to the Harter Act, 46 U.S.C. § 1311 * * * or any other relevant legislation." Accordingly, we must inquire as to whether the defendant carrier stipulated that liability after discharge would be limited as to damages in some manner unless a higher valuation were declared. The loss herein was occasioned after discharge of the missing container from the ship to land. This is easily inferred from the fact that the missing container (absent its contents) was discovered on the streets of Manhattan. Clause 13 of the bill of lading issued by the defendant Moore-McCormack Lines, Inc., provides, in pertinent part, as follows: "In case of any loss or damage to or in connection with goods exceeding in actual value $500 * * * per package, or, in case of goods not shipped in packages, per customary freight unit, the

value of the goods shall be deemed to be $500 per package or per unit * * * and the carrier's liability *in any capacity,* if any, shall be determined on a value of $500 per package or per customary freight unit". (Emphasis supplied.) We conclude, therefore, that the carrier's status as bailee of the goods upon discharge from the ship is still governed by the limitation of liability provision (clause 13) in the bill of lading, under the Harter Act *(cf. Calderon v Atlas S.S. Co.,* 170 US 272).

It is well recognized that "[w]hile a bailee's liability for failure to return the property may be predicated upon breach of contract or upon negligence, a bailee may also be held liable to the bailor in conversion for his failure to return the thing bailed" (5 NY Jur, Bailment, § 43, p 54). Conversion may be committed, *inter alia,* by failing to redeliver the property to the bailor in accordance with the bailment contract. In recognizing the conversion theory underlying the plaintiff's breach of bailment action in *I.C.C. Metals v Municipal Warehouse Co.* (50 NY2d 657, 662), the Court of Appeals duly noted that "a warehouse which fails to redeliver goods to the person entitled to their return upon a proper demand, may be liable for either negligence or conversion, depending upon the circumstances". If the goods were lost as a result of the bailee's negligence, and the parties agreed to limit the bailee's potential liability, the limitation will be honored. "If the warehouse converts the goods, however, strong policy considerations bar enforcement of any such limitation upon its liability". *(I.C.C. Metals v Municipal Warehouse Co.,* 50 NY2d, at p 663.) Plaintiff in *I.C.C. Metals* on its motion for summary judgment demonstrated delivery of the goods to the defendant bailee, a proper demand for return and the bailee's failure to honor that demand. Defendant bailee, in opposition, made *only* an unsupported, conclusory explanation for the loss, to wit, that the goods were stolen. The Court of Appeals declared (pp 664-665): "Upon this record, it is beyond cavil that plaintiff would be entitled to judgment had it elected to sue defendant in negligence * * * We now hold that such a record also suffices to sustain plaintiff's action in conversion, thereby rendering inapplicable the contractual limitation upon defendant's liability".

In footnote 4 to its opinion (p 665), the Court of Appeals stated: "We emphasize * * * that we do not suggest by our holding in this case that proof of negligence will support a recovery in conversion. Rather, our holding is limited to those situations in which the warehouse fails to provide an adequate explanation for its failure to return stolen goods. If the warehouse comes forward with an explanation supported by evidentiary proof in admissible form, the plaintiff will then be required to prove that the loss was due to either negligence or conversion, depending on the circumstances".

In the instant case before us, the carrier, occupying the status of a bailee (equivalent to the warehouse in *I.C.C. Metals, supra*) in opposition to the plaintiff's motion for summary judgment, made *no* explanation for the failure to return the goods. Accordingly, the carrier is not entitled to the limitation upon its liability imposed by clause 13 in the bill of lading.[2]

In the absence of contrary statutory authority (Federal or State) and the issue not having heretofore been specifically addressed, there is no impediment to the courts of this State following the public policy of this State as enunciated by our highest State court respecting the effect of the failure of the bailee to explain its failure to return the goods (see *Straus & Co. v Canadian Pacific Ry. Co.*, 254 NY 407, *supra; I.C.C. Metals v Municipal Warehouse Co., supra*).

I conclude on this record that the evidence submitted upon the parties' motions for summary judgment demonstrates that the contents of the shipping container (the plaintiff's packages) and not the shipping container constitute the "package" within the meaning of COGSA, and

---

2. As aptly noted by the Court of Appeals in *I.C.C. Metals v Municipal Warehouse Co.* (50 NY2d, at p 665); "the law properly refuses to allow a warehouse * * * to avoid liability by simply pleading ignorance of the fate of the stored merchandise. To allow the warehouse to so easily escape its responsibilities would be to place the bailor in an untenable position and would serve to encourage both dishonesty and carelessness. Clearly, the temptation to convert stored property would be significantly increased could the warehouse then avoid all civil liability by simply denying all knowledge of the circumstances of the loss and placing upon the bailor the well nigh impossible burden of determining and proving what happened to his property".

that, in any event, the limitation of liability provision is unenforceable under the circumstances herein.

Accordingly, the order of the Supreme Court, New York County (SHAPIRO, J.), entered February 19, 1980, granting plaintiff's motion for summary judgment, directing an assessment of damages and denying defendant Moore-McCormack Lines, Inc.'s motion for partial summary judgment, should be affirmed.

ROSS, MARKEWICH and LYNCH, JJ., concur with MURPHY, P. J.; LUPIANO, J., concurs in an opinion.

Order, Supreme Court, New York County, entered on February 19, 1980, affirmed. Respondent shall recover of appellant $75 costs and disbursements of this appeal.