N.S. v T.S. (2025 NY Slip Op 51897(U))

[*1]

N.S. v T.S.

2025 NY Slip Op 51897(U)

Decided on December 1, 2025

Supreme Court, Nassau County

Dane, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 1, 2025
Supreme Court, Nassau County

N.S., Plaintiff,

against
T.S., Defendant.

Index No. xxxxxx/2022

Edmund M. Dane, J.

Introduction
After a non-jury trial, this Court is ostensibly presented with a difficult question: whether or not the transmission of a sexually transmitted infection from one spouse to another constitutes a form of domestic violence within the context of the Court's obligation to equitably dispose of the parties' marital property? DRL § 236(B)(5)(d)(14) provides, in sum, that in determining an equitable disposition of property, the Court shall consider whether either party has committed an act or acts of domestic violence against the other party and the nature, extent, duration and impact of such act or acts. Whether or not the transmitting spouse's conduct was intentional, or unintentional but reckless, this Court answers that question in the affirmative. To this point, the Court holds that one spouse's transmission of a sexually transmitted infection to the other spouse constitutes a form of domestic violence. For the reasons that follow in this Decision and Order, the Wife is hereby awarded 100% of the marital assets which are subject to equitable distribution.

Background

These parties were married on xxxx 2019. They have one (1) child together, to wit, XXXX, born xxxx 2019. The Plaintiff (hereinafter referred to as the "Wife") was born on xxxx, [*2]1985. The Defendant (hereinafter referred to as the "Husband")[FN1]
was born on xxxx 1987. The Wife commenced the within matrimonial action against the Husband on April 11, 2022 by the filing of a Summons and Verified Complaint with the Nassau County Clerk's Office. The Wife appeared through counsel, Capetola & Divins, P.C. While the Husband participated in this action, he is currently serving a term of incarceration at Mohawk Correctional Facility in Rome, New York. The parties appeared before this Court for a Preliminary Conference on July 29, 2022. The Husband did not sign the proposed Preliminary Conference Stipulation & Order. The Court, therefore, so ordered same simply as an Order of the Court (hereinafter referred to as the "PC Order").
On September 12, 2022, this Court issued an Order Assigning Counsel Pursuant to Judiciary Law 35(8) whereby it assigned Mark Green, Esq., as attorney for the Husband solely on the issues of custody and parental access. On October 21, 2022, this Court issued an Order Appointing Attorney for the Child whereby it appointed Lisa Silverman, Esq., as attorney for the subject child. On January 9, 2023, and due to the resignation of Ms. Silverman from the panel, this Court issued an Order Appointing Attorney for the Child whereby it appointed Susan G. Mintz, Esq., as attorney for the subject child. On April 24, 2023, this Court issued a Certification Order. On August 22, 2023, an Order of Fact-Finding and Disposition (Hon. Robin M. Kent, J.S.C.) was issued by the Nassau County Family Court which, inter alia and in sum and substance, adjudged that the Husband had neglected the subject child. An Order of Protection was issued by the Family Court on August 22, 2023. On January 12, 2024, an Order of Protection was issued by the Nassau County District Court (Hon. David Kirschner) in favor of the subject child. That Order of Protection expires January 11, 2039. On January 12, 2024, an Order of Protection was issued by the Nassau County District Court (Hon. David Kirschner) in favor of the Wife. That Order of Protection also expires January 11, 2039. On April 10, 2024, the Wife filed a Note of Issue & Certificate of Readiness for Trial.
On May 20, 2024, this Court issued a Decision and Order (hereinafter referred to as the "May 2024 Order") which, inter alia and in sum and substance, granted the Wife summary judgment on the issues of custody and parental access, awarded the Wife sole legal, physical and residential custody of the child, and directed that the Husband have no contact or communication, of any kind whatsoever, with the subject child. See generally N.S. v. T.S., 82 Misc 3d 1253(A) (Supreme Court Nassau County 2024). On December 2, 2024, this Court issued a Decision and Order (hereinafter referred to as the "December 2024 Order") which, inter alia and in sum and substance, denied without prejudice and with leave to renew so much of the Wife's application seeking summary judgment on the issue of child support and denied so much of the Wife's application seeking summary judgment on the issue of equitable distribution. On July 31, 2025, this Court issued a Decision and Order (hereinafter referred to as the "July 2025 Order') which, inter alia and in sum and substance, precluded the Husband from offering at trial any evidence or defense, testimonial or documentary, with respect to any documents directed to be produced by the PC Order and any requests set forth in the Plaintiff's Notice for Discovery & [*3]Inspection.

Trial Date

The trial of this matter commenced and concluded on October 20, 2025. Given the Husband's incarcerated status, the Court elected to conduct this matter virtually via Microsoft Teams, which the Court found to be necessary to carry into effect the powers and jurisdiction possessed by the Court. See generally Judiciary Law § 2-b(3).[FN2]
At trial, the only two witnesses were the Wife and the Husband. The Wife was represented at the trial by Capetola & Divins, P.C. The Husband proceeded pro se.

The Trial Testimony

A. Wife's Case

1. Testimony of the Wife:
Direct Examination
The Wife testified with respect to background information. She was born xxxx, 1985. The parties were married on May xx, 2019. The parties have one (1) child together, named, born on xxxx 2019.
The Wife testified with respect to an incident on February 17, 2022. The Wife was at Cohen's Children's Medical Center. The child had surgery the day prior to February 17, 2022. The Wife was in child's hospital room. The Husband arrived at hospital on February 17, 2022, only after the Wife "begged" him to come pick-up her and the child. The Husband entered the room. The Wife was upset at that time that the Husband left the Wife and the child alone. The Husband told the Wife that the parties should get a divorce. The Husband told the Wife that the child was coming home with him. The Wife told the Husband that the child was going home with her. At that time, the Husband took out a gun from his pocket. The Wife was holding the child at this time. The Husband reiterated that the child was coming home with him, and told the Wife that if she were to come near the home, he would "shoot you on site". The Husband then pointed the gun towards the Wife and the child. When a hospital employee entered the room at that time and was standing in doorway, the Wife yelled "help". The Husband proceeded to put the gun in his pants. The Husband told the Wife again that she was not allowed to go home and that she needed to figure out where she could stay. The Husband, after he left the hospital room, told the Wife on the phone that if she comes back to the home, it would be easy for him because he could shoot her while she was sleeping. The police were then called. The police found the Husband in the parking lot with two (2) guns and drugs. The Husband was sentenced to seven years imprisonment and plead guilty to a felony. The Husband is currently incarcerated. There were two Order(s) of Protection issued, one in favor of the Wife and one in favor of the child. The Husband cannot contact the Wife or the child until 2039. There was also a finding of neglect against the Husband.
The Wife testified with respect to other incidents of domestic violence. The Husband previously threatened the Wife's life when the Wife confronted the Husband about excessive [*4]drug use and the Husband spending money on heroin. In October of 2020, the Husband told the Wife that if she did not shut the fuck up and leave him alone, he would kill her, he would kill the child and he would kill himself. He told the Wife this while he was holding a gun.
The Wife testified with respect to the Husband's drug use. The Husband would use heroin, crack and cocaine. The Husband admitted to using drugs. The Husband would pay for drugs with large amounts of cash that he withdrew from checking account ending xxx4438. The Husband would take cash withdrawals during the marriage anywhere from two to three times per week. At any given time, he would withdraw between $200 and $800. The Wife estimates that approximately $60,000 was used on drugs and nonmarital expenses. When the Wife would confront the Husband about these withdrawals, the Husband would become violent and defensive. While the Husband would "storm" away, he told the Wife that if she was still there when he got back, he would kill her.
The Wife testified with respect to a text message that the Husband sent to her. The Husband sent the Wife a text message that he was going to kill her and then himself. The Husband threatened to "kill us". The Wife believed that the Husband would kill her. The Wife did not call the police because the Husband told her that if she called the police, he would kill her before the police arrived.
The Wife testified with respect to what she believed were the Husband's tendencies. The Wife characterized the Husband as very "dangerous" and "violent". The Wife described that, during arguments between the parties, the Husband put a blanket over the Wife's head and proceeded to choke her. The Husband once punched the Wife in the face, and the Wife sustained a black eye. The Husband once threw a frying pan at the Wife. The Husband once swung a vacuum at the Wife as if he was swinging a baseball bat.
The Wife testified with respect to an incident in November, 2021. The Husband punched the Wife in the face. The Wife had confronted the Husband about spending money and going on out dates with other women in the city while the parties could not even afford to pay their own bills. The Husband was not working at this time. The Husband got upset that the Wife broached this issue with him. The Wife was injured and she suffered a black eye.
The Wife testified with respect to sexually transmitted infections ("STI's") that she was infected with by the Husband. The Wife testified that the STI's that she was infected with were the direct result of the Husband's affairs, as she was not sleeping with anyone else. The Wife was in "agonizing" pain after she contracted them. The Wife went to her gynecologist and was tested for STI's. The Wife tested positive for herpes simplex virus 1 ("HSV-1"), herpes simplex virus 2 ("HSV-2") and human papillomavirus ("HPV"). The HPV led to the development of cancerous cells in the Wife's cervix. She had to have surgery to remove these cells. The Wife now has to take medicine, namely, acyclovir, for the rest of her life.
The Wife testified with respect to an incident in December, 2020. The Husband's friend was staying with the parties. The Wife was home with the child. The Husband and the Husband's friend went out, and, when they returned, the Husband tried to bring another woman back to the home. The Wife was home and the child was sleeping. After the Wife confronted the Husband, the other woman sped off. The Husband went on a "rampage", and he was smacking himself in head with his loaded gun. The Husband told the Wife to "get the fuck out" or "I will kill you". The Husband proceeded to point the gun at his friend. The friend jumped out the window, and [*5]the Wife left to go and stay with her uncle.
The Wife testified with respect to the incident with the frying pan. The kitchen sink had been clogged for approximately two weeks. The Wife asked the Husband to fix it, but the Husband said that he would do it when he wants to. The Husband then proceeded to pick up the greasy frying pan, which was in the sink, and threw the frying pan at the Wife.
The Wife testified with respect to how the Husband's conduct made her feel. She now has "crippling" anxiety and lives in "paralyzed fear" every day. When the Wife would go to her uncle's home and stay there, the Husband would tell the Wife that if she returned home, he would "shoot her on site".
The Wife testified with respect to the Husband's weapons. They were kept in the closet, but the Husband always kept a loaded gun on the night table. The Husband, during the marriage, would purchase weapons from the bank account at Chase bank ending xxx4438.
The Wife testified as to the residence located at 89 Baisley Avenue, East Rockaway, New York (hereinafter referred to as the "East Rockaway Residence"). It was purchased on April 1, 2019, which was prior to the parties' marriage. The Wife took a $50,000 loan from her TDA for the down payment. The Wife paid mortgage on the East Rockaway Residence.. The East Rockaway Residence was sold in May of 2022 for $450,962. The Wife derived the sum of $3,934.55 in net proceeds of sale. The Wife sold the East Rockaway Residence because she could no longer financially maintain it. She seeks that the proceeds of sale be declared her separate property.
The Wife testified with respect to her employment. She is a teacher with the New York City Department of Education. She has been employed as a teacher since 2009. In 2024, the Wife earned approximately $100,000.
The Wife testified with respect to the Husband's employment. The Husband worked in construction during the parties' marriage.
The Wife testified with respect to money contributed by the Husband. Since the Husband's incarceration, he has not contributed anything to the support of the subject child. The Wife was granted sole custody of the subject child. Since the Husband's arrest, the Husband has not provided the Wife with any support. The Wife pays food, clothing, shelter, school, extracurricular activities, and, as she described it, "everything". The Husband can earn minimum wage when he is released from prison. The Husband worked before his incarceration and claimed that he is taking college courses while he is in prison. The Wife seeks child support retroactive to the date of commencement of this action.
The Wife testified with respect to her account at Chase Bank (ending xxx438). This account was funded with the income that the Wife earned from employment. This account was previously titled in the name of the Wife and the Wife's mother. The Wife's mother is now deceased. At times, there was money in the account from the Social Security for the Wife's mother, which money was used to pay for the nursing home. There was some money in this account from various jobs that the Husband had. However, the Husband would pay for drugs from this account. This account had a value of approximately $626.38 as of the date of the commencement of this action. The Wife seeks to have this account declared her separate property.
The Wife testified with respect to her account(s) Chase Bank (ending xxx3301 and [*6]ending xxx9036). The Wife opened both of these accounts after the commencement of this action.
The Wife testified with respect to retirement benefits. The Husband does not have any retirement benefits. The Wife has retirement benefits through her employment. The Wife has a Qualified Pension Plan ("hereinafter referred to as a "QPP") and a Tax Deferred Annuity (hereinafter referred to as the "TDA") with the Teacher's Retirement System. The Wife's TDA and QPP existed prior to parties' marriage and the Wife was contributing to same prior to the parties' marriage. The Wife was also contributing to the QPP and the TDA during the parties' marriage. The Husband never contributed to the QPP or the TDA. The QPP had a value of $18,374.25 as of the date of date of marriage and the TDA had a value of $45,938.86 as of the date of marriage. The QPP had a value of $22,369.77 as of March 1, 2022 and the TDA had a value of $130,829.88 as of March 1, 2022. The Wife seeks that these accounts be distributed such that she receive 100% of same.
The Wife testified with respect to her counsel fees. She paid her counsel a $7,500 retainer and owes her counsel approximately $32,000. The Husband has delayed this litigation. The Husband has ignored court orders and refused to produce discovery.
Cross Examination
The Wife was questioned about the incident in the hospital in February of 2022. The Wife acknowledged that there were other "patients" in the room that she was in with the child when the Husband entered. The Wife could not definitively say what color the gun was that the Husband was holding, but testified that the gun was "maybe" black.
The Wife was questioned about confronting the Husband about his drug use. The Wife conceded that when the Husband and his friend went out to Manhattan together, it was approximately a two-hour round trip. When asked why she did not call the police during this two-hour period of time, the Wife responded that she was "nervous" to do so, and that she figured that the Husband would be released back and would become more violent when he was released.
The Wife was questioned about the Husband's jobs. There was a business called "Aurora Home Repair". The Wife conceded that it was "their" business" but also testified that the Husband ran the business. The Husband was hired to paint a home, but only showed up on the job "a few times". There were also people who sued the Husband because they hired the Husband to perform work, but the Husband never finished the work. One customer provided the Husband a "large deposit" for a basement job, but the person who hired the Husband fired the Husband, and the Husband never returned the deposit he received. The Husband also performed work for friends and co-workers of the Wife.
The Wife was questioned about the East Rockaway Residence. The Wife conceded that when she purchased the residence, the condition of it "wasn't great" and she described it as "fair. The Wife acknowledged that the residence needed "many" repairs. The Wife conceded that the Husband did some of the repairs, but also testified that she did some of the repairs, and that some of the repairs were done by friends and family. The Wife conceded that the Husband rebuilt the kitchen. The Wife conceded that the Husband "re-plumbed" the residence. The Wife conceded that the Husband re-did the flooring. The Wife conceded that the Husband did a majority of the siding, although it was never completed. When asked how the proceeds of sale of the East [*7]Rockaway Residence were only (approximately) $3,000, the Wife testified that she refinanced the home because they had no money to pay their bills, and new mortgage on the residence was higher than the initial mortgage. At the closing of title, the mortgage was satisfied, commissions were paid, the lawyers were paid, and closing costs were paid. The Wife acknowledged that the down payment may have only been approximately ten (10%) percent of the purchase price. The Wife conceded that the East Rockaway Residence increased in value from when she purchased it, but she was unsure as to whether the increase in value was due to market forces or because of improvements on the residence.
The Wife was questioned about a motorcycle. The Wife owned a motorcycle in her name. The payment for the motorcycle came from the Chase Bank account (ending xxx4438). The purchase price was $7,000 and it was purchased during the parties' marriage. The motorcycle was sold, and the sale proceeds were $2,400. The motorcycle was sold after the commencement of this action. The sale proceeds of $2,400 were deposited into the Chase Bank account (ending xxx4438) and the sale proceeds were spent on living expenses for the Wife and the child.
The Wife was questioned about her Chase Bank account (ending xxx4438). The Wife conceded that the Husband made financial contributions to this account. The Wife conceded that she spent money from this account from the time of the Husband's arrest to the time of the commencement of this action. While the Wife was not sure about the amount she spent, the money went to pay for food, clothing and shelter.
The Wife was questioned about the purchasing of firearms/guns. The Wife conceded that she purchased firearms, but those purchases were not for herself. She purchased them because the Husband "made" or "forced" her to do so. The Husband once sent the Wife a text message (when she was approximately seven months pregnant), accusing the Wife of not appreciating him. He also threatened to leave her if she did not do anything nice to him. The Husband wanted a Mossberg 500. The Wife was afraid at that time that the Husband would desert her and the child, so she purchased a Mossberg 500 for the Husband.
The Wife was questioned about the Husband delaying the case. The Wife conceded that the Husband had been "bounced around" two different prisons.
The Wife was questioned about the child's extracurricular activities. The child participates in dance, girl scouts and stem class. The Wife has been paying for these costs without contribution from the Husband.
Re-Direct Examination
The Wife testified with respect to the $50,000 loan for the purchase of the East Rockaway Residence. The down payment was $32,000, and the balance of the money was used for home repairs.
The Wife testified with respect to some of the repairs on the East Rockaway Residence. The Wife paid for the cost of the plumbing repairs., and she paid for the siding, which was never completed.
The Wife testified with respect to "Aurora Home Repair". While this business was only registered to the Wife, it was done so only because the Husband was in poor moral standing. The Husband owed $70,000 in unpaid child support for his first child and had prior domestic violence charges on his record. The Wife never performed any work for Aurora Home Repair. It was dissolved during the parties' marriage, and there were no remaining assets or funds.
The Wife testified as to the child's extracurricular activities. The cost of dance is $85 per month. The cost of girl scouts is $100 for the year plus the cost of field trips and parties. The cost of the stem class is $30 per week.
Re-Cross Examination
The Wife was questioned about the cost of the siding and the pipes for the plumbing repairs. She could not remember how much she paid for this.
B. Husband's Case
1. Testimony of the Husband:
Direct Examination
The Husband testified in the form of a narrative. His position is that anything he is awarded, he wants those monies to be held in escrow for the benefit of the child. He wants to be reimbursed for the costs of improving the East Rockaway Residence. He wants to be reimbursed for the truck that was sold for $4,800, and he wants to be reimbursed for the motorcycle that was sold for $2,400.
Cross Examination
The Husband was questioned about the sale of the RAM truck. The Husband conceded that he never produced a bill of sale.
The Husband was questioned about what he produced in this action. He conceded that he did not produce any bank records. He conceded that he never filed an Answer is this action.
The Husband was questioned about that he has paid on behalf of the child since his incarceration. The Husband conceded that he has not paid anything to the Wife since his incarceration.
Post-Trial Summations

Neither party submitted written post-trial summations to the Court. The parties provided the Court with oral summations on October 20, 2025.

DECISION + ORDER

It is well established that where the findings of fact rest in large measure on considerations relating to the credibility of the witnesses, deference is owed to the trial court's credibility determinations. See Pappas v. Liapes, 138 AD3d 943 (2d Dept. 2016); see also Lawson-Groome v. Smalls, 144 AD3d 633 (2d Dept. 2016). There were only two (2) witnesses at the trial: the Husband and the Wife. The Court found the Wife to be remarkably credible. The Court found the Husband to lack credibility.
GROUNDS
On October 20, 2025, an Inquest was held before this Court and the Wife was granted a Judgment of Divorce pursuant to DRL § 170 subd. (7), which Judgment was held in abeyance pending adjudication of the remaining financial issues.
CUSTODY & PARENTING TIME
The issues of custody and parenting time were heretofore determined by the Court's May 2024 Order.
EQUITABLE DISTRIBUTION
DRL § 236(B)(5)(a) provides:
Except where the parties have provided in an agreement for the disposition of their property pursuant to subdivision three of this part, the court, in an action wherein all or [*8]part of the relief granted is divorce...shall determine the respective rights of the parties in their separate or marital property, and shall provide for the disposition thereof in the final judgment.
The Domestic Relations Law recognizes that a marital relationship is an economic partnership, and during such marriage, spouses share in both its profits and losses. When the marriage is dissolved, however, courts are charged to equitably distribute both the assets and liabilities remaining from the marriage. Fields v. Fields, 15 NY3d 158 (2010). A trial court considering the factors set forth in the Domestic Relations Law has broad discretion in deciding what is equitable under all of the circumstances. Krolikowski v. Krolikowski, 110 AD3d 1449 (4th Dept. 2013). In recognizing marriage as an economic partnership, DRL § 236 mandates that the equitable distribution of marital assets be based on the circumstances of the particular case and directs the courts to consider a number of statutory factors. Potvin v. Potvin, 193 AD3d 995 (2d Dept. 2021). DRL § 236(B)(1)(c) provides:
The term "marital property" shall mean all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action, regardless of the form in which title is held, except as otherwise provided in agreement pursuant to subdivision three of this part. Marital property shall not include separate property as hereinafter defined.
Indeed, when it comes to the equitable distribution of marital property, DRL § 236 (B)(5)(d)(13) authorizes the trial court to take into account "any other factor which the court shall expressly find to be just and proper." Consequently, the trial court has substantial flexibility in fashioning an appropriate decree based on what it views to be fair and equitable under the circumstances. Mahoney—Buntzman v. Buntzman, 12 NY3d 415 (2009). However, the Court is ever-mindful that equitable distribution does not necessarily indicate equal distribution. Henery v. Henery, 105 AD3d 903 (2d Dept. 2013); see also Ropiecki v. Ropiecki, 94 AD3d 734 (2d Dept. 2012). It is well established that the fundamental purpose of equitable distribution law is the recognition of marriage as an economic partnership (see e.g. Fields v. Fields, 15 NY3d 158 (2010); Price v. Price, 69 NY2d 8 (1986); Mesholam v. Mesholam, 11 NY3d 24 (2008)) and that marital property "should be construed broadly in order to give effect to the 'economic partnership' concept of the marriage relationship recognized in the statute" (see Price, supra; see also Burke v. Burke, 175 AD3d 458 (2d Dept. 2019)). In this case, the Court has carefully considered the factors in equitably distributing the marital assets as follows:
1. The income and property of each party at the time of marriage and at the time of the commencement of the action. There was no documentary evidence in the record at trial as to the income of either party at the time of the marriage in 2019. There was no testimony or evidence in the Record as to the property of the Husband at the time of the marriage. The testimony and evidence in the Record reflected that the Wife owned the East Rockaway Residence prior to the parties' marriage, and that she participated in the QPP and TDA prior to the parties' marriage. This action was commenced on April 11, 2022. Neither party provided [*9]proof of their respective income(s) in 2022. The Wife earned $106,203 in 2024.[FN3]
The Husband is currently incarcerated and earned $0.00 in 2024.
2. The duration of the marriage and the age and health of both parties. These parties were married on May 21, 2019, and this action for divorce and ancillary relief was commenced on April 11, 2022. This is a marriage with a duration of approximately thirty-four (34) months. The Wife is approximately forty (40) years old and the Husband is approximately thirty-eight (38) years old. There was testimony in the Record, which was uncontradicted, that the Wife now suffers from two STI's which were transmitted to her by the Husband. There was no evidence in the record at trial that the Husband suffers from any health maladies or infirmities.
3. The need of a custodial parent to occupy or own the marital residence and to use its household effects. The East Rockaway Residence, which was the Wife's separate property (see infra), was sold.
4. The loss of inheritance and pension rights upon the dissolution of the marriage as of the date of the dissolution. The Wife will lose the right to inherit from the Husband and the Husband will lose the right to inherit from the Wife, unless otherwise expressly set forth in the Trust, if applicable.
5. Loss of health insurance benefits upon dissolution of marriage. The Record was barren of any documentation concerning existing health benefits of the parties, but, in any event, upon the entry of a Judgment of Divorce, neither party will be permitted to be covered under the other's health insurance plan, subject to his or her rights under COBRA.
6. Any award of maintenance. The Court has declined to award maintenance to either party (see infra).
7. Any equitable claim to interest in or direct or indirect contribution made to the acquisition of such marital property of the party not having title including joint efforts or expenditures and contributions and services as a spouse, parent, wage earner and homemaker, and to the career or career potential of the other party. The Court does not find this factor to be applicable in this case.
8. The liquid or non-liquid character of all marital property. The largest liquid asset(s) of this marriage at this time appear to be the Wife's QPP and the Wife's TDA.
9. The probable future financial circumstances of each party. The Husband is currently serving a term of incarceration and is unemployed. The Wife earned approximately $106,000 in 2024. The Wife has been gainfully employed for years. The Husband worked in construction prior to his incarceration.
10. The impossibility or difficulty of evaluating any component asset of any interest in a business, corporation or profession and the economic desirability of retaining such asset or interest intact and free from any claim or interference by the other party. This factor is inapplicable.
11. The tax consequences to each party. There was no evidence in the record at trial of the tax consequences that either party may face upon the dissolution of their marriage and the distribution and allocation of the marital assets and liabilities.
12. The wasteful dissipation of assets by either spouse. There was testimony in the [*10]Record that the Husband used marital money to purchase firearms and that he used marital money on nonmarital expenses, such as on other women.
13. Any transfer or encumbrance made in contemplation of a matrimonial action without fair consideration. There was no testimony or proof that either party made a transfer or encumbrance in contemplation of this matrimonial action.
14. Whether either party has committed an act or acts of domestic violence, as described in subdivision one of section four hundred fifty-nine-a of the social services law, against the other party and the nature, extent, duration and impact of such act or acts. This factor will be discussed in-depth herein (see infra).
15. In awarding the possession of a companion animal, the court shall consider the best interest of such animal. This factor is inapplicable.
16. Any other factor which the court shall expressly find to be just and proper. The Court has considered the fact that these parties were married for less than three (3) years.

*

In equitable distribution, courts are charged with classifying, valuing and distributing assets and liabilities. The initial determination of whether a particular asset is marital or separate property is a question of law. L.K.F. v. M.T.F., 82 Misc 3d 1223(A) (Supreme Court Nassau County 2024); see also Renck v. Renck, 131 AD3d 1146 (2d Dept. 2015). Each asset that is classified as marital property must be valued. See generally Sharabani v. Sharabani, 2017 NYLJ LEXIS 2707 (Supreme Court Kings County 2017) (once property has been deemed marital, the Court must fix a valuation date). The valuation of a marital asset must be founded in economic reality, and valuation is an exercise properly within the fact-finding power of the trial court. Davenport v. Davenport, 199 AD3d 637 (2d Dept. 2021). However, what is a matter of the court's broad discretion is selecting the dates for the valuation of marital assets and, depending on the particular circumstances of the case, the court may appropriately fix different valuation dates for different assets. Pappas v. Pappas, 140 AD3d 838 (2d Dept. 2016). The trial court has broad discretion in selecting valuation dates and may select any date between the date of commencement of the action and the date of trial. Carter v. Fairchild-Carter, 199 AD3d 1291 (3d Dept. 2021); see also DRL § 236(B)(4)(b). The court must then distribute the particular asset, and a trial court is vested with broad discretion in making an equitable distribution of marital property. Mahoney v. Mahoney, 197 AD3d 638 (2d Dept. 2021) (emphasis added); see also Westbrook v. Westbrook, 212 AD3d 1014 (3d Dept. 2023) (court has substantial discretion to fashion equitable distribution of marital assets) (emphasis added).

 *

Domestic Violence
In equitably distributing the parties' assets, the Court has given substantial and profound weight to acts of domestic violence which were perpetuated on the Wife by the Husband. Domestic violence can take many forms. Domestic violence can exist through the interpersonal relationship dynamics of two adults. K.E. v. A.E., 2025 NYLJ LEXIS 3235 (Family Court Kings County 2025). The 2020 amendment to DRL § 236 (B)(5)(d)(14) requires the Court to consider whether a party has committed acts of domestic violence, as that term is defined in the Social Services Law § 459(a), and the nature, extent, duration, and impact of such act or acts in determining equitable distribution of martial assets. C.S. v. R.H., 87 Misc 3d 1201(A) (Supreme [*11]Court New York County 2025). See also A.S. v. A.B., 84 Misc 3d 692 (Supreme Court Kings County 2024) (domestic violence is a factor that the courts shall consider when determining equitable distribution (emphasis added)).
1. Sexually Transmitted Infection(s)
During the Wife's direct testimony on her case-in-chief, she began sobbing when questioned regarding how she contracted certain STI's. The Wife credibly - and remarkably - testified that she was not engaging in sexual intercourse with any other individual but the Husband. The Wife's credible testimony established that she tested positive for HSV-1, HSV-2 and HPV [FN4]
during the parties' marriage. The Wife's testimony that she was in "agonizing" pain after she contracted these STI's was strikingly credible to the Court. The Wife also credibly testified that her contraction of HPV led to the development of cancerous cells, which she had to have surgically removed, and that her contraction of HSV requires her to take acyclovir - an antiviral medication - for the rest of her life. Critically, the Husband never refuted the Wife's testimony with respect to how, and more importantly from whom, she contracted HSV-1, HSV-2 and HPV. Stated simply, the Wife is a victim of domestic violence.
Social Services Law § 459-a(1) defines a victim of domestic violence as:
1. "Victim of domestic violence" means any person over the age of sixteen, any married person or any parent accompanied by his or her minor child or children in situations in which such person or such person's child is a victim of an act which would constitute a violation of the penal law, including, but not limited to acts constituting disorderly conduct, harassment, aggravated harassment, sexual misconduct, forcible touching, sexual abuse, stalking, criminal mischief, menacing, reckless endangerment, kidnapping, assault, attempted assault, attempted murder, criminal obstruction of breathing or blood circulation, strangulation, identity theft, grand larceny or coercion; and
(i) such act or acts have resulted in actual physical or emotional injury or have created a substantial risk of physical or emotional harm to such person or such person's child; and
(ii) such act or acts are or are alleged to have been committed by a family or household member.
In People v. Williams, the victim and the defendant engaged in sexual encounters which led to them having unprotected sexual intercourse. People v. Williams, 24 NY3d 1129, 1130 (2015). The defendant assured the victim that it was safe to engaged in unprotected sexual intercourse, with the victim and the defendant previously discussing the HIV virus and the need to be careful to avoid infection. Williams, 24 NY3d at 1130. After the victim learned that he was HIV positive, the defendant admitted that he had been diagnosed with HIV prior to the defendant and the victim becoming intimate. Id. at 1131. The trial court therein reduced the defendant's conviction of first-degree reckless engagement to second-degree reckless endangerment. Id. at [*12]1129.
In Doyle v. Kennedy, the parties therein began dating in April, 2021. Doyle v. Kennedy, 2024 NY Misc. LEXIS 64183 (Supreme Court New York County 2024). The defendant had assured the plaintiff that he had tested negative for any sexually transmitted infection(s) in or around March, 2020, and that he did not engage in any sexual activity with any person since that test. Doyle, 2024 NY Misc. LEXIS at *1. The plaintiff, therefore, assented to unprotected sexual intercourse. Id. The plaintiff learned, in June, 2021, that she had tested positive for herpes. Id. The plaintiff later learned that the defendant's most recent STI test was, in fact, in May, 2019, and that the defendant had sexual intercourse with a high-risk individual for an STI on New Year's of 2021. Id. The plaintiff thereupon commenced an action, interposing causes of action for assault and battery, intentional infliction of emotional distress, negligence/gross negligence, the Victims of Gender-Motivated Violence Protection Act; and assault and battery, rape, criminal sexual act, and aggravated sexual abuse. Id. In its decision, the Court wrote:
However, the facts alleged here, taken as true, do not constitute a sexual offense under any provision of Article 130 of the Penal Law or as incest under [Penal Law] §§ 255.26 or 255.27. Rather, the complaint's allegations support a charge of reckless endangerment under [Penal Law] §§ 120.20 or 120.25...or a violation of [Public Health Law] § 2307, which provides that any person who, knowing himself or herself to be infected with an infectious venereal disease, has sexual intercourse with another shall be guilty of a misdemeanor.
Id. at 6 (internal citations omitted).

New York Penal Law § 120.20 defines reckless endangerment in the second degree as:
A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person.
Reckless endangerment requires proof of reckless conduct. People v. Jakobson, 119 AD3d 815 (2d Dept. 2014). Reckless endangerment cannot be found in the absence of actual and substantial risk of serious physical injury. Matter of Lashlee v. Lashlee, 145 AD3d 723 (2d Dept. 2016). Often, there is no direct evidence of a defendant's mental state and the mens rea must be inferred circumstantially from the surrounding facts. People v. Smith, 79 AD2d 309 (1992). In order to establish that defendant engaged in reckless endangerment, the risk created by a defendant's conduct must be foreseeable and the conduct must actually create a risk of serious physical injury, and, additionally, there must be demonstrated a gross deviation from the standard of conduct of a reasonable person. People v. Kohler, 2024 NY Misc. LEXIS 70136 (Justice Court Torn of Clearance 2024). New York Penal Law § 15.05(3) provides:
Recklessly. A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.
The Court finds that the Husband acted reckless when he transmitted the HSV-1, HSV-2 and HPV virus(es) to the Wife by engaging in unprotected sexual intercourse with her after having an affair. Marriage occupies sacrosanct ground. People v. Lucas, 80 Misc 3d 574 (Supreme Court Albany County 2023). The annals of human history reveal the transcendent importance of marriage. Obergefell v. Hodges, 576 U.S. 644 (2015). Rising from the most basic human needs, marriage is essential to our most profound hopes and aspirations. Obergefell, 576 U.S. at 657. Marriage is more than a mere contract, and once the contract of marriage is executed, a relationship is created between the parties which is regulated by law. Spalter v. Spalter, 234 AD3d 508 (1st Dept. 2025). Naturally implicit in any marriage is trust. While this Court cannot stand in judgment of the Husband for astraying from his marriage to the Wife by having an extramarital affair, the Court can certainly consider the consequences of it. While every individual is, of course, free to make choices, one must own those choices, especially when they come with adverse consequences. Indeed, while people seek to dissolve their marriages, and while no marriage may last forever, a marriage is not a license - nor should it be treated as permission - for one spouse to contract an STI and transmit that STI to the other spouse. Stated as simply as it can be: in that instance, there must be consequences.
The Court is able to infer the existence of the Husband's affair due to the Wife's credible testimony with respect to the incident where the Husband returned to the East Rockaway Residence with another female. Coupled with that inference, the Husband never denied the Wife's allegation(s) that he was engaged in an extramarital affair. Morever, it is readily apparent that the Wife had not contracted any STI's prior to the parties' marriage, but had only contracted same after the parties' marriage. Finally, the Wife credibly testified that she was, in effect, not engaging in sexual relations with anyone else other than the Husband. The upshot being, therefore, that the Wife could have only contracted STI's from the Husband. The Court finds that the Husband acted recklessly when he engaged in an extramarital affair, which put him at risk of - and resulted in him - contracting HSV-1, HSV-2 and HPV. And the Husband, after engaging an an extramarital affair, thereafter having unprotected sexual intercourse with the Wife, constitutes the appropriate degree of recklessness to conclude that the Husband committed reckless endangerment. The Court finds that the risk created by the Husband's conduct was foreseeable, namely, that having unprotected sexual intercourse with someone not his spouse carried with it the risk of transmission of an STI and the Court concludes that the Husband's conduct created a risk of physical injury, namely, the Wife's excruciating pain and the cancer cells which developed. Lastly, the Husband's unprotected sexual intercourse with someone not his spouse was a gross deviation from the standard of conduct of a married person.
2. Physical Acts/Treats
Additionally, the Court has also considered the Husband's other acts of domestic violence. To this end, the Court has considered the incident on February 17, 2022 at Cohen's Children's Hospital when the Husband pointed a gun at the Wife and the child and told the Wife that if she returned to the East Rockaway Residence, he would shoot her on site. The Court has also considered the Husband's conduct of putting a blanket over the Wife's head and choking her, [*13]the Husband punching the Wife in the face, which caused the Wife to sustain a black eye,[FN5]
and the Husband throwing a frying pan at the Wife. The Wife testified to all of these incidents credibly, and the Husband, critically, failed to refute the Wife's allegations. The Court has also considered, in assessing the Husband's conduct, the Husband's test message to the Wife [FN6]
:
Wife: So now what
Husband: Now you come back here and I kill you
And then me
Idc [sic]
Done
Test it if you want to
Wife: I think we should just talk. I don't want to fight with u [sic]
Husband: I can't do that
I'm going to kill us
Wife: That makes no sense

 *

A. East Rockaway Residence
Classification. These parties were married on May xx, 2019. The deed to the East Rockaway Residence reflects that the Wife acquired same in her sole name on April 1, 2019.[FN7]
Property acquired before the marriage is separate property. Rosenstock v. Rosenstock, 53 Misc 3d 1218(A) (Supreme Court Kings County 2016). Inasmuch as the Wife acquired the East Rockaway Residence prior to the parties' marriage, the Court ordinarily would have classified same as her separate property. However, there is no dispute that the East Rockaway Residence was sold.
Other Claims. The closing statement to the East Rockaway Residence reflects that the Wife received net proceeds of $3,934.55. Inasmuch as the East Rockaway Residence would have been classified as the Wife's separate property (see supra), the Husband is not entitled to a share in the net proceeds of sale. The Husband produced no evidence at trial as to how much, if at all, the mortgage on the East Rockaway Residence was paid-down during the marriage. Therefore, he failed to substantiate any claims with respect to the parties' post-marriage principal mortgage pay down. In addition, while there was testimony that the Husband performed repairs on the East Rockaway Residence during the parties' marriage, the Husband failed to substantiate how much money was spent on the repairs performed. Likewise, the Husband failed to offer into evidence any cognizable proof of the increase in value, if any, of the East Rockaway Residence as a result of the work performed on same. Therefore, the Court declines to award the Husband any relief with respect to same. Accordingly, it is hereby:
ORDERED, that the net proceeds of sale of the East Rockaway Residence shall be deemed the Wife's sole and separate property; and it is further
ORDERED, that the Husband has no claim, marital, equitable or otherwise in and to the East Rockaway Residence.
B. The Parties' Vehicles
Classification. There was no testimony or evidence at trial regarding ownership of any vehicles by the Husband. The Wife purchased a Toyota Corola on December 1, 2023, which was after the commencement of this action. Inasmuch as the Wife acquired the Toyota Corola after the commencement of this action, said vehicle is, therefore, the Wife's separate property. Accordingly, it is hereby:
ORDERED, that the Husband shall be responsible for any and all cost(s) associated with his vehicle(s); and it is further
ORDERED, that the Toyota Corola automobile be and shall be the Wife's sole and separate property; and it is further
ORDERED, that the Wife shall be responsible for any and all cost(s) associated with her Toyota Corola vehicle.
C. Personal Property
Classification. There was no testimony or evidence with respect to the issue of personal property. The Court therefore declines to distribute any personal property. Accordingly, it is hereby:
ORDERED, that each party shall retain any personal property in his or her respective possession(s).
D. Wife's Case Bank Checking Account (account number ending xxx4438)
Classification. The Wife's checking account at Chase Bank (ending xxx4438) was previously titled in the name of the Wife and the Wife's mother (who is now deceased). The evidence at trial was insufficient to establish the opening date of the account, but there was testimony that money earned by the Wife during the marriage was deposited into this account. The Court therefore classifies this account as a marital asset subject to equitable distribution.
Valuation. The only statement in evidence at Trial for this account reflects an account value of $626.38 as of April 12, 2022.[FN8]
The Court therefore values this account as of April 12, 2022, which is a date closest in time to the date of commencement of this action, and values the account at $626.38.
Distribution. The Court declines to equitably distribute any portion of this account to the Husband such that the Wife shall receive one hundred (100%) percent of this account. In arriving at that distribution, the Court has considered the substantial acts of domestic violence perpetuated by the Husband against the Wife, the de minimis value of the account as of April 12, 2022, and the fact that there was testimony at trial that some of the funds in this account were used to pay for the nursing home for the Wife's mother. Accordingly, it is hereby:
ORDERED, that the Wife's checking account at Chase Bank (account number ending xxx4438) shall be distributed such that the Wife shall receive one hundred (100%) percent of the value of this account.
E. Wife's Chase Bank Checking Account (account number ending xxx3301)
Classification. While the Wife testified that she opened this account after the [*14]commencement of this action, the Wife's Statement of Net Worth reflects that it was opened on February 22, 2022, which was just prior to the commencement of this action. Therefore, the Court has no choice but to classify this account as a marital asset subject to equitable distribution.
Valuation. No evidence was submitted at the trial as to the value of this account on the date of commencement of this action. The Wife's Statement of Net Worth reflects an account balance of $2,758.00 as of August 15, 2025, which is the date in time closest to trial. Therefore, the Court values this account as of August 15, 2025, and values same at $2,758.00.
Distribution. The Court declines to award the Husband equitable distribution of this account, and distributes the account to the Wife such that she shall receive one hundred (100%) percent of same. In arriving at that distribution, the Court has considered the fact that this account was opened a mere two months prior to the commencement of this action and the fact that this account was opened during a period of time when the parties were physically separated. Accordingly, it is hereby:
ORDERED, that the Wife's checking account at Chase Bank (account number ending xxx3301) shall be distributed such that the Wife shall receive one hundred (100%) percent of the value of this account.
F. Wife's Chase Bank Savings Account (account number ending xxx9036)
Classification. The Wife testified at the trial that this account was opened after the commencement of this action. While there was no documentary evidence introduced in evidence at trial as to the value, or the date of opening of the account, the Court finds the Wife to have testified credibly in this regard. The Husband produced no evidence to refute this testimony. Therefore, it is hereby:
ORDERED, that the savings account at Chase Bank (account number ending xxx9036) shall be deemed the Wife's sole and separate property.
G. Wife's QPP Account
Classification. While the Wife acquired her QPP account prior to the parties' marriage upon her commencement of employment as a teacher, there is no question that the Wife was contributing to her QPP during the parties' marriage. Therefore, the Court classifies a portion of the Wife's QPP Account as marital property subject to equitable distribution. Valuation. As of March 31, 2022, the Wife's QPP Account was worth $22,369.77.[FN9]
This action was commenced on April 11, 2022, so the Court cannot value the account as of March 31, 2022. The Wife's Statement of Net Worth reflects that her QPP was valued as $13,527 as of the date of commencement of this action. There was no evidence of the account value as of the date of trial. Therefore, the Court values the QPP Account as of April 12, 2022, which is the date of the commencement of this action, and values the QPP at $13,527.00. Distribution. The Court awards the Wife one hundred (100%) percent of the value of the QPP Account, and declines to distribute any portion of this account to the Husband. The reason for arriving at that conclusion is the Husband's profound acts of domestic violence against the Wife, including transmitting to her HSV-1, HSV-2 and HPV, which have caused the Wife to require medication for the rest of her life and to undergo surgery for the removal of cancer cells, and the Husband threatening to kill [*15]the Wife by telling her he would "shoot her on site" and the Husband punching the Wife in the face. Accordingly, it is hereby:
ORDERED, that the Wife's QPP Account shall be distributed such that the Wife shall receive one hundred (100%) percent of the value of this account.
H. Wife's TDA Account
Classification. While the Wife acquired her TDA account prior to the parties' marriage upon her commencement of employment as a teacher, there is no question that the Wife was contributing to her TDA during the parties' marriage. Therefore, the Court classifies a portion of the Wife's TDA Account as marital property subject to equitable distribution. Valuation. As of March 31, 2022, the Wife's TDA Account was worth $130,829.88.[FN10]
This action was commenced on April 11, 2022, so the Court cannot value the account as of March 31, 2022. The Wife's Statement of Net Worth reflects that her TDA was valued as $90,339 as of the date of commencement of this action. There was no evidence of the account value as of the date of trial. Therefore, the Court values the TDA Account as of April 12, 2022, which is the date of the commencement of this action, and values the TDA at $90,339. Distribution. The Court awards the Wife one hundred (100%) percent of the value of the TDA Account, and declines to distribute any portion of this account to the Husband. The reason for arriving at that conclusion is the Husband's profound acts of domestic violence against the Wife, including transmitting to her HSV-1, HSV-2 and HPV, which have caused the Wife to require medication for the rest of her life and to undergo surgery for the removal of cancer cells, and the Husband threatening to kill the Wife by telling her he would "shoot her on site" and the Husband punching the Wife in the face. Accordingly, it is hereby:
ORDERED, that the Wife's TDA Account shall be distributed such that the Wife shall receive one hundred (100%) percent of the value of this account.
MAINTENANCE [FN11]

For matrimonial actions commenced after January 23, 2016, the post divorce maintenance guidelines as contained in DRL § 236(B), which establishes a formula and guidelines, must be applied. The court must first apply one of two formulas based on the parties' respective incomes, capping the Payor's income at $228,000.00. Where the Payor's income is below or equal to the income cap and is also paying child support to the Payee, the calculation is as follows: calculate 20% of the Payor's income (up to $228,000.00) and subtract 25% of the Payee's income. Then, the Court must calculate 40% of the parties' combined income (capping the Payor's income at $228,000.00) and subtract the Payee's income. Next, the Court compares the resulting amounts from both calculations and the lesser amount is the presumptive amount of maintenance. The statute expressly provides that maintenance shall be calculated prior to child support because the amount of maintenance awarded shall be subtracted from the Payor's income and added to the Payee's income as part of the calculation of the child support obligation.
Notwithstanding the formulas set forth above, the statute provides the Court with [*16]flexibility to deviate from the presumptive amount of temporary maintenance. Thus, the Court may, in its discretion, adjust the award of maintenance in a situation where: (i) the Payor's income exceeds the statutory cap of $228,000.00; or (ii) the Court finds that the guideline amount of maintenance would be unjust and inappropriate. If the Court chooses to do so, it shall consider any one or more of a list of factors set forth in the statute. The aforementioned factors are as follows (see DRL § 236[B][6][e][1]):
a) The age and health of the parties;
b) The present or future earning capacity of the parties, including a history of limited participation in the workforce;
c) The need of one party to incur education or training expenses;
d) The termination of a child support award during the pendency of the temporary maintenance award when the calculation of temporary maintenance was based upon child support being awarded and which resulted in a maintenance award lower than it would have been had child support not been awarded;
e) The wasteful dissipation of marital property, including transfers or encumbrances made in contemplation of a matrimonial action without fair consideration;
f) The existence and duration of a pre-marital joint household or a pre-divorce separate household;
g) Acts by one party against another that have inhibited or continue to inhibit a party's earning capacity or ability to obtain meaningful employment. Such acts include but are not limited to acts of domestic violence as provided in section 459-A of the Social Services Law;
h) The availability and cost of medical insurance of the parties;
i) The care of children or stepchildren, disabled adult children or stepchildren, elderly parents or in-laws provided during the marriage that inhibits a party's earning capacity;
j) The tax consequences to each party;
k) The standard of living the parties established during the marriage;
l) The reduced or lost earning capacity of the payee as a result of having forgone or delayed education, training, employment or career opportunities during the marriage; and
m) The equitable distribution of marital property and the income or imputed income on the assets so distributed;
n) The contributions and services of the payee as a spouse, parent, wage earner and homemaker and to the career or career potential of the other party; and
o) Any other factor which the court shall expressly find to be just and proper.
When the Court determines that the guideline amount of maintenance would be unjust or inappropriate, the Court shall set forth, either in writing or on the record, the factor(s) it considered, the reasons for the deviation, and also the guideline amount of maintenance (see DRL §236[B][5-a][h][1]). The Court considered the statutory factors when determining the amount and duration of maintenance. In particular, the Court considered:
A. Duration of the Marriage, Age and Health of the Parties. The parties were married on May 21, 2019. This action for divorce was commenced on April 11, 2022. This is a marriage of approximately thirty-five (35) months. The Wife is approximately forty (40) years old and the [*17]Husband is approximately thirty-eight (38) years old. There was no testimony or evidence that the Husband suffers from any health maladies or infirmities. The testimony revealed that, because of the Husband, the Wife became infected with multiple STI's (see supra), one of which caused cancer cells to develop in the Wife.
B. Present and Future Earning Capacity. The Wife is gainfully employed as a teacher and,, in 2024, her gross income was $106,203.00. The Husband is currently incarcerated and does not earn any income.
C. Need to Incur Education or Training Expenses. There was no testimony offered with respect to either party's need to incur education or training expenses.
D. Termination of Child Support Award During Pendency of Temporary Maintenance Award. No order of temporary maintenance was issued by the Court during the pendency of this action. No order of pendente lite basic child support was issued during the pendency of this action. Therefore, this factor is inapplicable.
E. Wasteful Dissipation of Marital Property. The Wife testified and alleged that the Husband wastefully dissipated assets by purchasing guns and parts for guns and that he spent marital funds on other women.
F. Existence and Duration of a Pre-Marital Joint Household/Pre-Divorce Separate Household. This is a very short-term marriage of only thirty-five (35) months.
G. Acts Inhibiting a Party's Earning Capacity/Ability to Obtain Meaningful Employment. There was no testimony or evidence that either party undertook an act which inhibited or prevented the other party from obtaining meaningful employment.
H. Availability and Cost of Medical Insurance. There was minimal testimony and/or evidence, if any at all, regarding the cost of medical insurance.
I. Care of Children/Step-Children. The Court has considered the fact that the Husband has been incarcerated, and that the child has been living with the Wife for years. The Court has also considered that the Husband was directed not to have any contact or communication with the child pursuant to the May 2024 Order and that there is an Order of Protection in favor of the child against the Husband until the year 2039.
J. Tax Consequences. There was no testimony or evidence as to the tax consequences of any maintenance award in this matter.
K. Standard of Living Established During Marriage. There was little, if any, testimony regarding the parties' standard of living.
L. Reduced or Lost Earning Capacity of Payee. While the Husband is incarcerated which impedes his ability to earn income, he is incarcerated because of his own actions.
M. Equitable Distribution of Marital Property. The Court has considered, among other things, that is has awarded the Wife one hundred (100%) percent of the marital property because of the substantial and profound domestic violence of the Husband.
N. Contributions/Services of Payee Spouse. The Court gives little, if any, weight to this factor, as the Court notes that both parties have always worked full-time and that the Wife was always the primary caretaker of both children.
O. Any Other Factor that the Court Finds Just and Proper. The parties have been physically separated for years.

*

1. Determination of Income
Prior to reaching its determination of the appropriate amount of post-divorce maintenance, if any, the Court must determine the incomes of the parties. The Court notes that both parties are W-2 wage earners, and neither party has made an allegation that the other receives any income other than what has been claimed by the other party.
A. Husband's Income. The Husband is incarcerated and earned $0.00 in 2024.
B. Wife's Income. The Wife's 2024 Form 1040 U.S. Individual Income Tax Return reflects W-2 income of $106,203.00.[FN12]
Her gross income, for purposes of of computing spousal maintenance, is $98,078.48.[FN13]

2. Statutory Computations - DRL § 236(B)(6)(d)(1)
Pursuant to the aforesaid statutory calculations, this Court utilized the calculation where the Payor is not paying child support to the Payee.[FN14]
Accordingly, the Court made the following computation based upon the respective imputed income(s) to each of the party(ies): the payor's percentage ($98,078.48 x 30% = $29,423.54) minus the payee's percentage ($0.00 x 20% = $0.00) = $29,423.54. The Court then compared this resulting number with the following: payor's income ($98,078.48) plus payee's income ($0.00), which equals $98,078.48 x 40%, which equals $39,231.39. Next, the Court subtracted one hundred percent (100%) of the payee's income ($0.00 from $39,231.39), which equals $39,231.39. The lesser of these amounts is the "presumptive award" pursuant to the statute, which is $29,423.54 per year, or the sum of $2,451.96 per month.
3. Factors Considered - DRL § 236(B)(6)(d)(3)
The Court finds the presumptive amount of maintenance of $2,451.96 per month to be unjust and inappropriate in this case, and the Court declines to award the Husband any maintenance, based upon the multiplicity of factors set forth herein, in addition to that which is set forth aforesaid (see supra). First, the Court has considered the age and health of the parties. See DRL § 236(B)(6)(e)(1)(a). The Court has considered that the Husband is only thirty-eight (38) years old, and, upon his release from incarceration, nothing is stopping the Husband from obtaining employment and earning income. Second, the Court has considered the existence and duration of a pre-marital joint household or a pre-divorce separate household. See DRL § 236(B)(6)(e)(1)(f). To this point, the Court notes that this is a marriage of only thirty-five (35) months, and the parties did not reside together for a significant period of time. Third, the Court has considered the standard of living the parties established during the marriage. See DRL § 236(B)(6)(e)(1)(k). Neither party introduced evidence or convinced the Court that these parties lived a life of luxury, so the Court does not find that either party is in actual need of maintenance. Also, there was no evidence at trial at all of the parties' lifestyle. Fourth, the Court has considered any other factor that it finds just and proper. See DRL § 236(B)(6)(e)(1)(o). These [*18]parties have been living separately for years. Fifth, and finally, the Court has considered that the Husband failed to submit a sworn Statement of Net Worth during this trial, which would have warranted a denial of an application for spousal maintenance on procedural grounds.[FN15]

4. Conclusion
Accordingly, based upon all of the aforesaid factors and the facts and circumstances of this case, it is hereby:
ORDERED, that neither party is awarded maintenance.
BASIC CHILD SUPPORT
Child support is awarded pursuant to the Child Support Standards Act (hereinafter referred to as the "CSSA"). The CSSA sets forth a formula for calculating child support by applying a designated statutory percentage, based upon the number of children to be supported, to combined parental income up to a particular ceiling known as the statutory cap. Miller v. Miller, 216 AD3d 1154 (2d Dept. 2023). The CSSA provides a three-step method for calculating child support. The first step is to compute combined parental income. Second, the combined parental income is multiplied by a designated percentage based upon the number of children to be supported. Finally, that amount is then allocated between the parents by applying each parent's respective portion to the total income. Hughes v. Hughes, 200 AD3d 1404 (3d Dept. 2021). Under CSSA, the court must determine the amount to be paid to the custodial parent based on a percentage of the parents' total income for child support purposes. The court applies a percentage to that income, less certain deductions, up to $183,000.00.
For child support purposes, after deducting FICA Social Security taxes and FICA Medicare taxes from each party's gross wages/gross pay, the income of the Wife is $98,078.48 (see supra) and the income of the Husband is $0.00 [FN16]
(see supra). The combined parental income of $98,078.48. The Wife's pro rata share of the combined parental income is one hundred (100%) percent and the Husband's pro rata share of the combined parental income is zero (0%) percent. The applicable child support percentage is seventeen (17%) for the one (1) unemancipated child, which in this case equals $16,673.34 as and for a combined child support obligation. Therefore, the Husband's pro rata share (to wit: 0%) of the combined child support obligation is $0.00 per year or $0.00 per month and Wife's pro rata share (to wit: 100%) of the combined child support obligation is $16,673.34 per year or $1,389.45 per month.
However, DRL § 240(1-b)(f) provides:
The court shall calculate the basic child support obligation, and the non-custodial parent's pro rata share of the basic child support obligation. Unless the court finds that the non-custodial parents's [parent's] pro-rata share of the basic child support obligation is unjust or inappropriate, which finding shall be based upon consideration of the following factors:
(1) The financial resources of the custodial and non-custodial parent, and those of the [*19]child;
(2) The physical and emotional health of the child and his/her special needs and aptitudes;
(3) The standard of living the child would have enjoyed had the marriage or household not been dissolved;
(4) The tax consequences to the parties;
(5) The non-monetary contributions that the parents will make toward the care and well-being of the child;
(6) The educational needs of either parent;
(7) A determination that the gross income of one parent is substantially less than the other parent's gross income;
(8) The needs of the children of the non-custodial parent for whom the non-custodial parent is providing support who are not subject to the instant action and whose support has not been deducted from income pursuant to subclause (D) of clause (vii) of subparagraph five of paragraph (b) of this subdivision, and the financial resources of any person obligated to support such children, provided, however, that this factor may apply only if the resources available to support such children are less than the resources available to support the children who are subject to the instant action;
(9) Provided that the child is not on public assistance (i) extraordinary expenses incurred by the non-custodial parent in exercising visitation, or (ii) expenses incurred by the non-custodial parent in extended visitation provided that the custodial parent's expenses are substantially reduced as a result thereof; and
(10) Any other factors the court determines are relevant in each case, the court shall order the non-custodial parent to pay his or her pro rata share of the basic child support obligation, and may order the non-custodial parent to pay an amount pursuant to paragraph (e) of this subdivision.
The Court elects to upwardly deviate from the presumptive amount of child support of $0.00.[FN17]
In arriving at this determination, the Court has expressly considered the standard of living the child would have enjoyed had the marriage or household not been dissolved. See DRL § 240(1-b)(f)(3). In this respect, a review of the Wife's Statement of Net Worth reveals aggregate expenses of $3,270.00 per month for the costs of housing and food and clothing for the child. Therefore, the Court upwardly deviates from the presumptive amount of basic child support under the CSSA and directs the Husband to pay basic child support in the sum of $1,660.00 per month. Shelter costs, like food and clothing, inhere in the basic child support obligation. Iacono [*20]v. Iacono, 145 AD3d 972 (2d Dept. 2016). There is simply no reason why the Husband should not be contributing towards 50% of those costs of the child, especially given that the Wife's pro rata share of the statutory add-on expenses set forth herein require her to pay for 100% of those costs (see infra). A party's child support obligation commences, and is retroactive to, the date the application was made. See DRL § 236(B)(7)(a); see also Malkani v. Malkani, 208 AD3d 863 (2d Dept. 2022). The Wife requested child support for the parties' children in the Rider to her Verified Complaint [FN18]
filed with the Court on April 11, 2022. Therefore, the award is made retroactive to April 11, 2022. Accordingly, it is hereby:
ORDERED, that the Wife is awarded and the Husband is hereby directed to pay basic child support for the one (1) unemancipated child, A.S., in the monthly sum of $1,660.00 per month, commencing on first day of the first full month following the date of this Decision and Order and payable prospectively on the first (1st) of each month thereafter until the emancipation of the first child; and it is further
ORDERED, that this award is retroactive to April 11, 2022, the date of first request. Retroactive basic child support arrears are hereby calculated to be and fixed at $72,486.66.[FN19]
Retroactive sums due by reason of this basic child support award shall be paid at the rate of $500.00 per month in addition to the sums awarded until all arrears have been satisfied. The Husband is entitled to a credit for sums paid for actual maintenance and support of the children (see Peltz v. Peltz, 56 AD2d 519 (1st Dept. 1977); see also Pascale v. Pascale, 226 AD2d 439 (2d Dept. 1996)); and it is further
ORDERED, that unless otherwise agreed to by the parties in writing, the Husband's basic child support obligation shall be paid through the Support Collection Unit/Child Support Enforcement Bureau.
HEALTH INSURANCE
Domestic Relations Law § 240(1) provides, in part, "[w]here employer or other organization subsidized health insurance coverage is available, the court shall order the legally responsible relative to enroll eligible dependents" for coverage under the policy". Vlak v. Nelissen, 206 AD2d 521 (2d Dept. 1994). New York Codes, Rules and Regulations defines a legally responsible relative as "any person who is legally obligated to furnish support for a child, or spouse and child". N.P. v. D.M., 2024 NYLJ LEXIS 3631 (Family Court Nassau County 2024). The Court has granted the Wife sole legal custody of the child. It therefore finds it appropriate to direct the Wife, the custodial parent of the child, to enroll the child, to the extent not already enrolled, in her health insurance plan. Accordingly, it is hereby:
ORDERED, that, to the extent not already enrolled, the Wife shall enroll the child in her [*21]health plan and shall maintain such health insurance coverage for the child until the child's emancipation; and it is further
ORDERED, that the Wife shall pay one hundred (100%) percent of the child's monthly health insurance premiums.[FN20]

UNREIMBURSED/UNINSURED HEALTH CARE EXPENSES
With respect to unreimbursed health care expenses, pursuant to Domestic Relations Law § 240 (1-b)(c)(5)(v), each parent's share of unreimbursed health care expenses is to be prorated in the same proportion as each parent's income is to the combined parental income. See generally Castello v. Castello, 144 AD3d 723 (2d Dept. 2016). Accordingly, it is hereby:
ORDERED, that the cost of the unemancipated child's reasonable uninsured/unreimbursed medical, dental, pharmaceutical and optical expenses incurred by or on behalf of the unemancipated child shall be paid with the Wife one hundred (100%) percent of said expenses, provided in-network providers are utilized absent an emergency, or if the child have a pre-existing relationship with an out-of-network provider.[FN21]

CHILD CARE EXPENSES
With respect to child care expenses, pursuant to the CSSA, where the custodial parent incurs child care expenses as a result, inter alia, of employment or vocational training, the noncustodial parent may be required to pay his or her proportionate share of such expenses as a supplement to the basic support obligation, and such expenses shall be prorated in the same proportion as each parent's income is to the combined parental income (see DRL § 240(1-b)(c)(4); see McBride v McBride, 238 AD2d 320, 321, (2d Dept. 1997). See Matter of Wallin v. Wallin, 53 AD3d 663 (2d Dept. 2008). Accordingly, it is hereby:
ORDERED, that the Wife shall pay one hundred (100%) percent of the costs of the child's childcare expenses incurred by the Wife in furtherance of her employment or vocational training in furtherance of her employment.[FN22]

LIFE INSURANCE
DRL § 236(B)(a)(8) provides, inter alia, that:
"...[i]n any matrimonial action the court may order a party to purchase, maintain or assign a policy of insurance providing benefits for...child support...[t]he court may also order a party to purchase, maintain or assign a policy of accident insurance or insurance on the life of either spouse, and to designate in the case of life insurance, either spouse or children of the marriage, or in the case of accident insurance, the insured spouse as irrevocable beneficiaries during a period of time fixed by the court. The obligation to provide such insurance shall cease upon the termination of the spouse's duty to provide maintenance, child support or a distributive award..."
A life insurance policy should generally be maintained the secure a party's child support obligation. See generally Corless v. Corless, 18 AD3d 493 (2d Dept. 2005); see also Geller v. Geller, 69 AD3d 563 (2d Dept. 2010). The Court notes that the child just attained the age of six (6) years. To this end, it is hereby:
ORDERED, that within thirty (30) days of the date of this Decision and Order, the Husband shall obtain and/or maintain a policy of life insurance on his life with a death benefit in the sum of $300,000.00,[FN23]
naming the Wife as beneficiary to secure his pro-rata share of the total child support obligation; and it is further
ORDERED, that upon the Husband obtaining the requisite life insurance set forth in the preceding decretal paragraph (see supra) set forth in this Decision and Order, the Wife party is permitted to submit a Qualified Life Insurance Order to the Court for signature.
COUNSEL FEES
A review of the Wife's billing statements/statements for services rendered with her counsel reflect that she has incurred total counsel fees of $72,002.02 with her counsel, with a balance due to her counsel as of the July 30, 2025 invoice of $17,156.40. DRL § 237(a), the statutory predicate for an award of counsel fees, provides as follows:
(a) In any action or proceeding brought...for a divorce...the court may direct either spouse...to pay counsel fees and fees and expenses of experts directly to the attorney of the other spouse to enable the other party to carry on or defend the action or proceeding as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties. There shall be a rebuttable presumption that counsel fees shall be awarded to the less monied spouse. In exercising the court's discretion, the court shall seek to assure that each party shall be adequately represented and that where fees and expenses are to be awarded, they shall be awarded on a timely basis, pendente lite, so as to enable adequate representation from the commencement of the proceeding.
An award of counsel fees pursuant to Domestic Relations Law § 237(a) is a matter within the sound discretion of the trial court, and the issue is controlled by the equities and circumstances of each particular case. Fugazy v. Fugazy, 210 AD3d 653 (2d Dept. 2022). This is an application for a final award of counsel fees at the end of the parties trial. In Duval v. Duval, the Second Department explained:
In determining whether to award final counsel fees at the end of trial, a more detailed inquiry is warranted and the court must review the financial circumstances of both parties together with all the other circumstances of the case, which may include the relative merit of the parties' positions. The court may also consider whether either party has engaged in conduct or taken positions resulting in a delay of the proceedings or unnecessary litigation. At that point, the court is in the best position to determine whether counsel fees should be charged to the moneyed spouse, or charged to the less moneyed spouse as an offset against the equitable distribution award ultimately received, or divided between the parties.
Duval v. Duval, 144 AD3d 739 (2d Dept. 2016) (internal citations omitted); see also and see generally Klestadt v. Klestadt, 182 AD3d 592 (2d Dept. 2020). Among many factors, the court must consider the respective financial positions of the parties in determining whether an award is appropriate (see Borakove v. Borakove, 116 AD2d 683 (2d Dept. 1986)), the financial need of the party and the parties' disparate incomes (see Hausman v. Hausman, 162 AD2d 590 (2d Dept. 1990)), the time expended by counsel, the hourly rate for such services in the legal marketplace, the nature of the legal services rendered, the issues before the court and the professional standing of counsel. See DeCabrera v. Cabrera-Rosete, 70 NY2d 879 (1987).
Here, the Court finds that an award of counsel fees to the Wife is proper, but in the amount of $15,000.00. In this respect, the Court has considered, in arriving at the sum herein, that the Wife is the monied spouse, earning approximately $106,000 per year as to the Husband's $0.00 income. Additionally, the Court has considered the overall equitable distribution of the parties' assets, and notes that it has awarded the Wife one hundred (100%) percent of the marital assets herein. Those two factors are major factors that the Court has considered. However, the Court notes that the Husband unnecessarily prolonged this litigation by refusing to settle the issues of custody and parenting time despite his incarcerated status and despite the issuance of the Order of Protection in favor of the child until 2039. Additionally, the Court notes that the Husband prolonged this matter by refusing to produce a Statement of Net Worth and by refusing to produce mandatory and compulsory financial disclosure. The Court also notes that the Husband's conduct resulted in the Wife having to make an application for discovery sanctions. That conduct, as described herein, supra, cannot go unnoticed. The Wife's status as the "monied spouse" is not a bar to awarding her legal fees at the conclusion of this matter. The Court has reviewed the retainer agreement of the Wife's counsel and finds the fees charged to be reasonable, and the Court has reviewed the invoices of the Wife's counsel and finds that most of the fees charged therein were reasonable. Accordingly, it is hereby:
ORDERED, that the Wife's request for reimbursement of counsel fees be and the same is hereby GRANTED TO THE EXTENT that the Husband shall pay, directly to the Wife's counsel, Capetola & Divins, P.C., the sum of $15,000.00, within thirty (30) days of the service of the Judgment of Divorce with Notice of Entry; entry of the Judgment of Divorce; and it is further
ORDERED, that upon the failure of Defendant to pay the Plaintiff's counsel as set forth herein above, the Plaintiff's attorneys may file an Affidavit of Non-Compliance with the Clerk of the County, who shall enter a judgment, with statutory interest thereon as of the date of this Decision and Order, in favor of CAPETOLA & DIVINS, P.C., attorneys for the Plaintiff, as against the Defendant, T.S., without further proceedings.
MISCELLANEOUS
An Order directing the submission of the Findings of Fact, Conclusions of Law and Judgment of Divorce, consistent with this Decision and Order, shall be issued separately and simultaneously herewith, and Judgment is to be settled on notice in accordance with 22 NYCRR § 202.48.

* * *

Any other relief requested not specifically addressed herewith is hereby DENIED.
This constitutes the Decision and Order of this Court.
Dated: December 1, 2025
Mineola, New York
E N T E R:
Hon. Edmund M. Dane, J.S.C.

Footnotes

Footnote 1:While the Court, in this Decision and Order, will refer to the parties as "Husband" and "Wife", where appropriate, for the purposes of identifying the parties' exhibits proffered at trial, the Court will refer to the "Wife" as the "Plaintiff" and the "Husband" as the "Defendant".

Footnote 2:"...[b]y enacting Judiciary Law § 2-b(3), the Legislature has explicitly authorized the courts' use of innovative procedures...courts may fashion necessary procedures consistent with constitutional, statutory, and decisional law..." Perez v. 1857 Walton Realty Corp., 71 Misc 3d 1203(A) (Supreme Court Bronx County 2021).

Footnote 3:See Plaintiff's Exhibit "5", in evidence.

Footnote 4:The World Health Organization opines that STI's have a profound impact on sexual and reproductive health worldwide. World Health Organization, retrieved from 
https://www.who.int/news-room/fact-sheets/detail/sexually-transmitted-infections-(stis). Some STI's are curable. There are four types of viral STI's, including hepatitis B, herpes simplex virus (HSV), HIV and human papillomavirus (HPV).

Footnote 5:See Plaintiff's Exhibit "3", in evidence.

Footnote 6:See Plaintiff's Exhibit "2", in evidence.

Footnote 7:See Plaintiff's Exhibit "4", in evidence.

Footnote 8:See Plaintiff's Exhibit "6", in evidence.

Footnote 9:See Plaintiff's Exhibit "7", in evidence.

Footnote 10:See Plaintiff's Exhibit "7", in evidence.

Footnote 11:The Husband failed to submit a Statement of Net Worth in this action.

Footnote 12:See Plaintiff's Exhibit "5", in evidence.

Footnote 13:$106,203.00 [gross wages] - $6,584.59 [FICA Social Security taxes] - $1,539.94 [FICA Medicare wages] = $98,078.48.

Footnote 14:Inasmuch as the child resides with the Wife, and inasmuch as the Wife is the payor spouse under the statute, the Court utilized this formula.

Footnote 15:The Court nonetheless considered the issue of maintenance on the merits.

Footnote 16:The Court simply cannot impute any income to the Husband at this time. While the Husband is incarcerated because of his own conduct, the Court cannot ignore the simple fact that the Husband is incarcerated and unable to earn income. The Court therefore has no basis in this Record to impute income to the Husband at this time, as there is no record support for it. 

Footnote 17:To address the argument by the Husband that he is currently unable to work due to his incarceration, the Court does not find that same is a bar to ordering child support. Indeed, an award of child support is retroactive to application therefor. The Husband's incarcerated status notwithstanding, he has an obligation to support the child he brought into this world. The Husband is incarcerated because of his own conduct. To not award any child support, or the statutory minimum, would ostensibly result in punishment of this child. Upon the Husband's release from incarceration, and upon his attainment of employment, he can start making payments towards the arrears herein.

Footnote 18:See Plaintiff's Exhibit "1", in evidence.

Footnote 19:Arrived at and calculated as follows: $1,106.66 for April, 2022 [pro-rated for twenty (20) days in April, 2022]; 1,660.00 x 30 [days in April] = $55.33 per day x 20 [days from the date of Summons to end of April, 2022] + $13,280.00 for the remainder of 2022 [$1,660.00 x 8 months = $13,280.00] + $19,920.00 for year 2023 [$1,660.00 x 12 months = $19,920.00] + $19,920.00 for year 2024 [$1,660.00 x 12 months = $19,920.000] + $18,260.00 for year 2025 [$1,660.00 x 11 months (January - November] = $72,486.66.

Footnote 20:Inasmuch as the Court directs the Wife to pay one hundred (100%) percent of the health insurance premiums of the child, an award of retroactivity is not required.

Footnote 21:See footnote "19".

Footnote 22:See footnote "19".

Footnote 23:$1,660.00 (Husband's basic child support obligation) x 180 (months remaining until the child's emancipation) = $298,800.00.